**Francisco FONSECA, Petitioner,**

v.

**James E. HALL, et al., Corrections, Respondents.**

**No. CV 04–5836–CJC (RC).**

United States District Court, C.D. California.

July 18, 2008.

Francisco Fonseca, Blythe, CA, pro se.

Kenneth John Kao, Margaret E. Maxwell, Office of Attorney General of California, Los Angeles, CA, for Respondents.

ORDER ADOPTING FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CORMAC J. CARNEY, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the First Amended Petition and other papers along with the attached Final Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Final Report and Recommendation is approved and adopted; (2) the Final Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the First Amended Petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Final Report and Recommendation and Judgment by the United States mail on the petitioner.

### JUDGMENT

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the First Amended Petition for writ of habeas corpus is denied and the action is dismissed with prejudice.

### FINAL REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Final Report and Recommendation[1] is submitted to the Honorable Cormac J. Carney, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of

---

1. The sole difference between this Final Report and Recommendation and the initial Report and Recommendation is found at page 9, lines 7–8, which now reflects that petitioner filed a reply or traverse to respondent's answer.

the United States District Court for the Central District of California.

## BACKGROUND

### I

On April 25, 2000, in Los Angeles County Superior Court case no. KA044980, a jury convicted petitioner Francisco Fonseca of one count of conspiracy to commit kidnapping for ransom in violation of California Penal Code ("P.C.") § 182(a)(1) (count 1) and three counts of kidnapping for ransom in violation of P.C. § 209(a) (counts 2–4), and, as to all counts, the jury found that a principal was armed with a handgun within the meaning of P.C. § 12022(a)(1). Clerk's Transcript ("CT") 232–37, 240–43. The petitioner was sentenced to three consecutive terms of life with the possibility of parole on his kidnapping convictions and a life sentence on the conspiracy conviction, which was stayed pursuant to P.C. § 654. CT 244–46, 248–49.

The petitioner appealed his convictions to the California Court of Appeal, CT 247, which affirmed the judgment in an unpublished opinion filed April 12, 2001. Motion to Dismiss ("Motion"), Exh. C. On May 15, 2001, petitioner filed a petition for review in the California Supreme Court, which denied review on June 20, 2001.[2] *Id.,* Exhs. D–E.

On July 20, 2004,[3] petitioner filed a habeas corpus petition in the California Supreme Court,[4] which issued an Order to

---

**2.** In his petition for review to the California Supreme Court, petitioner raised three claims: (1) trial counsel rendered ineffective assistance of counsel by failing to object to the prosecution's divulgence of co-conspirators' convictions in violation of petitioner's rights to a fair trial and due process of law; (2) the trial court committed prejudicial error by instructing the jury under CALJIC no. 17.41.1; and (3) petitioner's sentence of three consecutive life terms constitutes cruel and unusual punishment in violation of the California and federal constitutions. Motion, Exh. D.

**3.** "Under the 'prison mailbox rule' ... a prisoner's ... habeas petition is deemed filed when he hands it over to prison authorities for mailing in the district court." *Huizar v. Carey,* 273 F.3d 1220, 1222 (9th Cir.2001) (citation omitted); *Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 2385, 101 L.Ed.2d 245 (1988). The "[mailbox] rule applies to prisoners filing habeas petitions in both federal and state courts." *Huizar,* 273 F.3d at 1223; *Anthony v. Cambra,* 236 F.3d 568, 574–75 (9th Cir.2000), *cert. denied.* 533 U.S. 941, 121 S.Ct. 2576, 150 L.Ed.2d 739 (2001).

**4.** In his habeas corpus petition to the California Supreme Court, petitioner raised the following claims: (1) the trial court violated petitioner's state and federal constitutional rights by failing to instruct the jury that lack of consent is an element of the crime of kidnapping for ransom under P.C. § 209(a); (2) the trial court's refusal to instruct on the defendant's theory of the case, i.e., defendant's reasonable and good faith mistake as to victims having consented to kidnapping for ransom, violated petitioner's due process and Fifth, Sixth and Fourteenth Amendment rights; (3) newly discovered evidence of perjury by critical prosecution witnesses shows petitioner was convicted on the basis of false testimony; (4) the prosecutor's failure to disclose material evidence favorable to defendant, i.e., that prosecution witnesses were induced to testify favorably in exchange for permission to remain in the United States in lieu of prosecuting and deporting them for illegal entry, violated petitioner's constitutional rights; and (5) ineffective assistance of trial and appellate counsel when: (a) trial counsel failed to adequately and properly raise the foregoing claims at trial; (b) trial counsel failed to request a tailored "pinpoint" instruction on reasonable mistake of fact regarding consent as a defense to kidnapping for ransom; (c) trial counsel failed to make a sufficiently specific request for discovery from the prosecution of inducements to prosecution witnesses to testify, i.e., permission to allow witnesses to remain in the United States unmolested by the INS in exchange for testimony favorable to the prosecution; (d) trial counsel failed to sufficiently investigate the prosecution's witnesses to deter mine that their version of facts may be false and that

Show Cause on November 18, 2004, returnable before the Los Angeles County Superior Court. *Id.,* Exhs. F, G at 120. On June 14, 2005, the Superior Court held an evidentiary hearing, and denied petitioner's habeas corpus petition. *Id.,* Exh. G at 122–23; Lodgment nos. 5–7, 10. On August 16, 2005, petitioner filed a habeas corpus application in the California Court of Appeal, which was denied on February 9, 2006. *Id.,* Exhs. H–I. On February 21, 2006, petitioner filed a second habeas corpus petition in the California Supreme Court,[5] which denied the petition on November 29, 2006, with citation to *In re Miller,* 17 Cal.2d 734, 112 P.2d 10 (1941).[6] Notice of Lodgment (May 9, 2006), Exh. A; Supplemental Opposition to Motion, Exh. 9.

## II

The California Court of Appeal, in affirming petitioner's convictions, made the following factual findings:[7] On June 10, 1999, Janet Renteria, Judith Renteria, Juan Salcedo and Alexander Salcedo entered the United States from Mexico illegally with the help of "Il Moreno." They believed that their aunt, Lorena Valasquez, and their uncle, Joel Salcedo, would pay Il Moreno for his services later.

Once across the border and in Calexico, the Renterias and Alexander Salcedo met with petitioner. Juan Salcedo returned to Mexico. Petitioner drove the Renterias and Alexander in a van to a house in El Monte. There, they met three other men, known to them as "Pepe" (Jose Beltran), "Chuy" (Jose Fonseca) and "Mono" (Arnaldo Cosio).[8] Alexander gave the men the telephone number for their aunt and uncle.

Beltran called Valasquez and Salcedo, told them that he had four of their nieces and nephews in the United States and demanded $1200 for each one. Salcedo told Beltran that he needed time to collect the money. Beltran said that he would call back. He called Salcedo several times over the next few days.

Janet, Judith and Alexander were kept at the house while the men waited for their aunt and uncle to raise the money. Petitioner was at the house every day. Judith and Janet did not feel free to leave. Judith observed a gun in Beltran's waistband.

On June 14, 1999, Salcedo told Beltran that he had the money. Beltran told him to go to the 7–11 on Santa Anita Street in El Monte. When Salcedo and Valasquez arrived at the 7–11, Salcedo called Beltran.

witnesses had been induced to testify by permitting them to remain in the United States free of INS interference in exchange for favorable testimony; and (e) appellate counsel was ineffective for failing to raise the claims raised herein. Motion, Exh. F.

**5.** In his second habeas corpus petition to the California Supreme Court, petitioner raised the same claims addressed in his initial habeas corpus petition. Lodgment, Exh. A, Attachment A.

**6.** The citation to *In re Miller* stands for the proposition that the petition was denied for the same reasons as a previous petition. *Kim v. Villalobos,* 799 F.2d 1317, 1319 n. 1 (9th Cir.1986). Here, petitioner's first habeas corpus petition to the California Supreme Court

was denied on the merits because it was denied without comment or a citation to authority, *Gaston v. Palmer,* 417 F.3d 1030, 1038 (9th Cir.2005), *amended by,* 447 F.3d 1165 (9th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 979, 166 L.Ed.2d 742 (2007); thus, the second habeas corpus petition also was denied on the merits. *Kim,* 799 F.2d at 1319 n. 1.

**7.** Motion, Exh. C at 35–37.

**8.** Jose Beltran, Jose Fonseca, and Arnaldo Cosio were tried separately from petitioner. This Court denied Beltran's habeas corpus petition in *Beltran v. Roe,* case no. CV 02–4375–R(RC) and denied Cosio's habeas corpus petition in *Cosio v. Runnels,* case no. CV 03–7228–CJC(RC).

Cosio and two other men drove Janet to the 7–11 in one car, while Beltran and petitioner drove Judith and Alexander in another car. When they reached the 7–11, Salcedo and Valasquez showed Beltran the cash which they had. Beltran grabbed the money, yelled that it was false, and drove away. As the men left the parking lot, they yelled to Salcedo that they were going to kill his nieces and nephew and dump their bodies in the desert.

Valasquez called the police, while Salcedo tried unsuccessfully to follow the men.

The men drove the Renterias and Alexander back to the house in El Monte. Petitioner was at the house. There, petitioner told Judith that she would be killed and her body thrown into the desert. Then, Cosio drove Janet and Judith to an apartment in Los Angeles in one car while Beltran drove Alexander in a separate car. Petitioner and Jose Fonseca were at the apartment when Janet and Judith arrived. There was a gun in the apartment, and Janet and Judith did not feel free to leave.

After about one and a half days, the Renterias and Alexander were moved to an apartment next door to the one they were put into initially. There were about 10 to 17 illegal immigrants in the apartment. They were guarded by Beltran.

While the Renterias and Alexander were being held at the apartments. El Monte Police investigated Valasquez's and Salcedo's complaint that their nieces and nephews were being held for ransom. Using the telephone numbers which Salcedo had called, the police located a house in El Monte. The police kept the house under surveillance, and eventually conducted a traffic stop of a car which drove away from the house. Jose Fonseca was the driver of the car and petitioner was a passenger. At about the same time, the police conducted a traffic stop of another car which drove away from the El Monte house. This car was driven by Beltran. Beltran

eventually gave police the address of an apartment in Los Angeles where he said the Renterias and Alexander were located.

Police went to the address given by Beltran and yelled "El Monte Police." Judith and Janet came to a window, and told police that they were being held against their will and that their captors were not in the apartment. Police forced the door open and found 16 people who had paid a fee to be smuggled into the United States.

At trial, petitioner testified that he was in El Centro following a visit to relatives in Mexico, and that he and a friend, Antonio, agreed to drive a van full of illegal immigrants, including Janet, Judith and Alexander, to El Monte. In return, petitioner would only have to pay $250 for his transportation.

They arrived at a house in El Monte at about 7 p.m. Petitioner was surprised to see his cousin, Jose Fonseca, at the house. Petitioner believed Jose lived in Mexico. Petitioner stayed at the house until 9 p.m., waiting for a ride.

The next day, June 13, petitioner went to his sister's house at about 9 a.m. and stayed there all day until about 8 p.m. He did not go to El Monte.

On June 14, Antonio visited petitioner and asked for the $250. At about 1 p.m., Antonio drove petitioner to a barbecue at the El Monte house. He saw Judith, Janet and Alexander. Petitioner returned home at about 9 p.m. He stayed home the rest of the evening. Petitioner did not threaten Janet or Judith. He did not learn of the 7–11 incident until after his arrest.

On June 15, petitioner called Jose Fonseca and asked him for a ride to perform some errands. Jose picked up petitioner. Beltran was in the car. They drove to the El Monte house and dropped

off Beltran. Later that day, petitioner was arrested.

## III

On July 12, 2004, petitioner, proceeding pro se, filed his initial habeas corpus petition challenging his convictions and sentence, and on August 11, 2004, this Court ordered the matter stayed and held in abeyance while petitioner exhausted his claims in the California courts. However, on August 17, 2005, the Court vacated the Order staying the proceedings, and on October 21, 2005, petitioner filed a First Amended Petition ("Petition") for habeas corpus relief, which is currently pending. On March 8, 2006, respondent filed a motion to dismiss the First Amended Petition, arguing it is a "mixed" petition, and subsequently respondent filed a supplemental brief claiming the petition is untimely. This Court then appointed counsel to represent petitioner in opposing respondent's motion to dismiss, and on January 22, 2007, petitioner, represented by counsel, filed an opposition to respondent's motion to dismiss.

On May 7, 2007, this Court denied respondent's motion to dismiss and ordered respondent to file an answer, finding the habeas corpus petition to be timely and that petitioner had exhausted his state court remedies. On September 4, 2007, respondent filed an answer, and on December 31, 2007, petitioner filed a reply or traverse.

In the First Amended Petition for writ of habeas corpus, petitioner raises the following claims:

Ground One—Trial counsel rendered ineffective assistance by "failing to object to the prosecutor's reference to the co-conspirator's [sic] convictions in violation of the 5th, 6th, and 14th Amendments" (Petition at 6a);

Ground Two—"Petitioner's three consecutive sentences of life with the possibili-

ty of parole violates the ban agianst [sic] cruel and unusual punishment in violation of the 8th and 14[sic] Amendment [s]" (Petition at 6b);

Ground Three—"Prosecutor's failure to disclose material evidence favorable to the accused," i.e., the prosecution witnesses had been induced to testify based on promises immigration authorities would permit them to remain in the United States in lieu of prosecuting and deporting them for illegal entry, prevented petitioner from receiving a full and fair hearing (Petition at 6c-j);

Ground Four—"Newly discovered evidence of perjury by critical prosecution witness(es)" shows petitioner was deprived of a fair trial (Petition at 6k-l);

Ground Five—"The trial court violated petitioner's federal constitutional rights by failing to instuct [sic] the jury that lack of consent is an element of the crime of kidnapping for ransom under California Penal Code § 209(A) [sic]" (Petition at 6l-o);

Ground Six—"The trial court's refusal to instruct on the defendant's theory of the case—defendant's reasonable and good faith mistake as to the victims' having consented to kidnapping for ransom [-] violates petitioner's rights under the due process clause" (Petition at 6o-p); and

Ground Seven—"Ineffective assistance of [trial and appellate] counsel" for (a) "failing to ... raise any of the foregoing claims at trial or on appeal"; (b) "failing to [make] a sufficiently specific request for discovery from the prosecution of inducements to the prosecution witnesses to testify"; (c) failing "to make a sufficiently tailored 'pinpoint' instruction on reasonable mistake of fact as to consent, as a defense to kidnapping for ransom"; (d) failing "to sufficiently investigate the prosecution witnesses to determine" false testimony and "that the witnesses had been

told they would be allowed to remain in the U.S. free of INS interference ... in exchange for testimony favorable to the prosecution"; and (e) failing to raise these grounds on appeal (Petition at 6p–q).

## DISCUSSION

### IV

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") worked substantial changes to the law of habeas corpus. *Moore v. Calderon,* 108 F.3d 261, 263 (9th Cir.), *cert. denied,* 521 U.S. 1111, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). Of specific importance to petitioner's claims are the revisions made to 28 U.S.C. § 2244(d), which now provides:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

\* \* \*

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

■■■ The California Supreme Court denied petitioner's request for review on June 20, 2001. Following the California Supreme Court's denial of review, a state prisoner has the option of seeking a writ of certiorari from the United States Supreme Court. 28 U.S.C. § 1257. Review by certiorari must be sought within ninety days after denial of the petition for review by the highest state court. 28 U.S.C.

§ 2101(d); Rules of the Supreme Court of the United States, Rule 13. If the petitioner does not seek certiorari in the Supreme Court, the direct review process is over at the end of the ninety-day period. *Whalem/Hunt v. Early,* 233 F.3d 1146, 1147 (9th Cir.2000) (en banc); *Bowen v. Roe,* 188 F.3d 1157, 1159 (9th Cir.1999). Thus, for petitioner, the AEDPA's statute of limitations began to run on September 19, 2001, and expired on September 18, 2002, one year from when his state court decision became final. *Ibid.* Here, the instant action was not filed until July 12, 2004—more than a year and a half after the statute of limitations had run.

However, this Court must consider whether the statute of limitations was tolled while petitioner's applications for collateral relief were pending. It was not statutorily tolled because all of petitioner's state court habeas petitions were filed after the statute of limitations expired. *Jiminez v. Rice,* 276 F.3d 478, 482 (9th Cir.2001), *cert. denied,* 538 U.S. 949, 123 S.Ct. 1627, 155 L.Ed.2d 492 (2003); *Green v. White,* 223 F.3d 1001, 1003 (9th Cir. 2000).

■■■ The Court must also consider whether there is any basis to equitably toll the AEDPA's statute of limitations. A habeas petitioner is entitled to equitable tolling "only if extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." *Miles v. Prunty,* 187 F.3d 1104, 1107 (9th Cir.1999) (citation and internal quotation marks omitted); *Espinoza–Matthews v. People of the State of California,* 432 F.3d 1021, 1026 (9th Cir.2005). The petitioner bears the burden of proving he is entitled to equitable tolling of the statute of limitations by showing: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S.

408, 418, 125 S.Ct. 1807, 1814, 161 L.Ed.2d 669 (2005); *Mendoza v. Carey,* 449 F.3d 1065, 1068 (9th Cir.2006). Additionally, "the prisoner must show that the 'extraordinary circumstances' were the but-for and proximate causes of his untimeliness." *Spitsyn v. Moore,* 345 F.3d 796, 799 (9th Cir.2003) (citations and internal quotation marks omitted); *Roy v. Lampert,* 465 F.3d 964, 969 (9th Cir.2006), *cert. denied sub nom., Belleque v. Kephart,* —— U.S. ——, 127 S.Ct. 1880, 167 L.Ed.2d 386 (2007).

Here, petitioner contends he is entitled to equitable tolling due to the alleged misconduct of the attorneys his family hired to file habeas corpus petitions on his behalf, and to support that contention petitioner has filed his own declaration and the declaration of his sister, Aracely Fonseca ("Aracely"). These declarations establish the following facts: Following the denial of his petition for review in mid–2001, petitioner asked his family to help him find a lawyer to file state and federal post-conviction petitions. Declaration of Francisco Fonseca ("Fonseca Decl.") ¶ 2. In August 2001, petitioner's sister visited attorney Jan Ronis, who advised her he would help petitioner for $25,000.00. Declaration of Aracely Fonseca ("Aracely Decl.") ¶ 1. On September 10, 2001, Aracely Fonseca returned to Ronis's office and paid him $10,000.00 to begin working on petitioner's case. *Id.* ¶ 2, Exh. A. On November 5, 2001, Ronis wrote petitioner, stating:

As I am sure you know by now, your sister has retained this office to represent you in connection with post-conviction relief available to you as a result of the denial of your appeal by the Court of Appeal. I have reviewed a copy of that decision as well as done other investigation relative to the trial held in Los Angeles Superior Court. From all the information I have reviewed I believe that you may have a good opportunity to prevail on a claim of ineffective assistance by your trial counsel.... [¶] After

I have obtained all of [your] records and documents I will review all of the material, especially the trial transcripts, and develop any issues that will hopefully allow us to return to the Superior Court and persuade the trial judge to grant you a new trial. I am quite confident from my review of the available information that you will be able to obtain relief in this matter. I will keep you informed of the events as they occur.

Fonseca Decl. ¶ 2, Exh. 2. The petitioner subsequently sent his legal papers to Ronis. *Id.* ¶ 2. On March 22, 2002, Aracely paid Ronis another $5,000.00. Aracely Decl. ¶ 4, Exh. B. Aracely called Ronis about petitioner's case on numerous occasions and repeatedly visited Ronis's office, and "Mr. Ronis always told [her] that he was working on it and everything was okay." *Id.* ¶ 5. Additionally, petitioner tried to contact Ronis by phone on several occasions, and wrote letters to him to find out about the status of his case. Fonseca Decl. ¶ 3. When Aracely inquired of Ronis about whether there is a one-year limitations period, he stated that was not true, and he repeatedly told her he was working on the case and she should not worry. Aracely Decl. ¶¶ 5–6. When Aracely realized Ronis "was not going to do anything for [petitioner, ]" she sought the return of her family's money, and Ronis refunded her $7,500.00 on September 15, 2003, and $7,500.00 on October 23, 2003. *Id.* ¶ 7, Exhs. C–D. On September 15, 2003, Ronis also provided Aracely with petitioner's transcripts. Supplemental Declaration of Aracely Fonseca ¶ 3.

On October 8, 2003, petitioner's father, Cirilo Fonseca, and Aracely retained attorney Jonathan Millberg, and paid him $5,000.00 "for the **sole** and **limited** purpose of evaluating the feasibility of habeas corpus proceedings challenging" petitioner's convictions and sentence. Aracely Decl. ¶¶ 9–10, Exh. E (emphasis in origi-

nal); Fonseca Decl. ¶ 5, Exh. 4. On April 15, 2004, Millberg sent petitioner a letter discussing his evaluation of petitioner's case. Fonseca Decl. ¶ 6, Exh. 5. After receiving Millberg's letter, petitioner sought the return of his transcripts, and on April 30, 2004, Millberg returned petitioner's transcripts to him. *Id.* ¶ 7, Exh. 6. Petitioner then prepared pro se his state and federal petitions. *Id.* ¶ 8.

 An attorney's mistake or negligence will not necessarily support equitable tolling of the AEDPA's statute of limitations period. *Lawrence v. Florida*, 549 U.S. 327, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007); *Miranda v. Castro*, 292 F.3d 1063, 1067 (9th Cir.), *cert. denied*, 537 U.S. 1003, 123 S.Ct. 496, 154 L.Ed.2d 399 (2002). However, egregious misconduct by an attorney "may constitute an 'extraordinary circumstance' warranting equitable tolling of AEDPA's statute of limitations." *Spitsyn*, 345 F.3d at 800; *see also Fleming v. Evans*, 481 F.3d 1249, 1256 (10th Cir. 2007) (" [S]ufficiently egregious misconduct on the part of a habeas petitioner's counsel may justify equitable tolling of the AEDPA limitations period."); *Schlueter v. Varner*, 384 F.3d 69, 76 (3d Cir.2004) ("[T]here are 'narrow circumstances in which the misbehavior of an attorney may merit' equitable tolling."), *cert. denied*, 544 U.S. 1037, 125 S.Ct. 2261, 161 L.Ed.2d 1067 (2005); *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir.2003) ("It is not inconsistent to say that attorney error *normally* will not constitute extraordinary circumstances required to toll the AEDPA limitations period while acknowledging that at some point, an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary." (emphasis in original)).

 Here, as in *Spitsyn*, Ronis was hired specifically to pursue post conviction relief on petitioner's behalf and, despite the attempts of petitioner and his family to track Ronis's progress in seeking postconviction relief for petitioner, Ronis never filed a habeas corpus petition on petitioner's behalf, although he repeatedly stated he was working on petitioner's case and everything was fine. Thus, petitioner has demonstrated egregious attorney misconduct warranting equitable tolling of the limitations period while Ronis was purportedly representing petitioner. *Spitsyn*, 345 F.3d at 801–02; *see also Fleming*, 481 F.3d at 1256–57 (equitable tolling may be warranted when petitioner's mother hired attorney to represent petitioner in postconviction proceedings, petitioner contacted counsel on several occasions to check on the status of his petition and was repeatedly assured that a petition was forthcoming, and counsel never filed a petition); *United States v. Martin*, 408 F.3d 1089, 1094 (8th Cir.2005) (equitable tolling appropriate when attorney consistently lied to petitioner and his wife about filing deadline and the status of petitioner's case, refused to communicate with petitioner or his family, and neglected to file any documents on petitioner's behalf despite being requested to do so); *Baldayaque*, 338 F.3d at 152–53 (attorney's failure to file petition when client expressly directed him to do so was extraordinary circumstance warranting equitable tolling). Moreover, petitioner and his family acted diligently in repeatedly calling, telephoning and visiting Ronis to try and ascertain Ronis's progress in filing a habeas corpus petition on petitioner's behalf. *See*, e.g., *Spitsyn*, 345 F.3d at 801 ("[Petitioner] and his mother appear to have made reasonable attempts to contact [the attorney] and to urge him to file the petition, which he had been hired and already paid to do. It is not evident that they should have concluded in time to hire another attorney that [the attorney they hired] was going to fail them completely."); *Martin*, 408 F.3d at 1095 (refusing to find fault with pro se petitioner for not timely

filing his habeas corpus petition when attorney who was hired to file motion to vacate on petitioner's behalf "specifically told [petitioner] time and again that there was no deadline, and that those who told him otherwise were wrong").

Based on the undisputed facts set forth above, petitioner is entitled to equitable tolling of the AEDPA's limitations period for the time during which he and his family were being deceived by Ronis about his intent to file state and/or federal habeas corpus petitions for petitioner. Therefore, the statute of limitations should be equitably tolled from September 19, 2001, when the limitations period would otherwise have commenced, until September 15, 2003, when Ronis returned petitioner's transcripts to him. As such, the initial habeas corpus petition filed by petitioner on July 12, 2004, is timely.

## V

█ The AEDPA "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade,* 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by the AEDPA, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim[¶](1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶](2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under AEDPA, a federal court shall presume a state court's determination of factual issues is correct, and petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

█ The California Supreme Court reached the merits of Grounds One and Two when it denied petitioner's petition for review without comment or citation to authority. *Gaston,* 417 F.3d at 1038; *Hunter,* 982 F.2d at 348. "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991); *Medley v. Runnels,* 506 F.3d 857, 862 (9th Cir.2007) (en banc), *cert. denied,* —— U.S. ——, 128 S.Ct. 1878, 170 L.Ed.2d 754 (2008). Thus, in addressing Grounds One and Two, this Court will consider the reasoned opinion of the California Court of Appeal, which denied those claims on the merits. *Byrd v. Lewis,* 510 F.3d 1045, 1048 n. 4 (9th Cir.2007); *Parle v. Runnels,* 505 F.3d 922, 926 (9th Cir. 2007).

The California Supreme Court also denied Grounds Three through Seven on the merits when it denied petitioner's second habeas corpus petition with a citation to *In re Miller.* In addressing Grounds Three and Four, this Court will consider the reasoned opinion of the Los Angeles County Superior Court, issued after holding an evidentiary hearing on these claims. *Stenson v. Lambert,* 504 F.3d 873, 884 (9th Cir.2007); *Fowler v. Sacramento County Sheriff's Dep't,* 421 F.3d 1027, 1038 (9th Cir.2005).

However, since Grounds Five through Seven have not been the subject of any reasoned state court decision, this Court

must conduct "an independent review of the record" to determine whether the California Supreme Court's denial of those grounds was contrary to, or involved an unreasonable application of, clearly established federal law. *Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir.2008); *Doe v. Woodford*, 508 F.3d 563, 567 (9th Cir.2007).

## VI

■ "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " *Ewing v. California*, 538 U.S. 11, 20, 123 S.Ct. 1179, 1185, 155 L.Ed.2d 108 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996–97, 111 S.Ct. 2680, 2702–03, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring)); *Taylor v. Lewis*, 460 F.3d 1093, 1097 (9th Cir.2006). This principle, however, "does not require strict proportionality between crime and sentence [,]" but rather, "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001, 111 S.Ct. at 2705 (Kennedy, J., concurring); *Taylor*, 460 F.3d at 1097–98; *see also Andrade*, 538 U.S. at 77, 123 S.Ct. at 1175 ("The gross disproportionality principle reserves a constitutional violation for only the extraordinary case."); *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

In Ground Two,[9] petitioner claims the imposition of three consecutive sentences of life with the possibility of parole violates the ban against cruel and unusual punishment because no physical harm was inflict-ed on the victims. There is no merit to this claim.

The California Court of Appeal denied petitioner's cruel and unusual punishment claim, holding:

> The issue of whether [petitioner's] sentence is cruel and unusual punishment is a fact intensive one, and is based on the nature and facts of the crime and offenders. . . .

> \* \* \*

> [Petitioner's] current offenses of kidnapping for ransom are serious. [Petitioner] contends that his sentence is nonetheless disproportionate because he had a low level of involvement in the kidnappings. The trial court found that [petitioner] was not a minor participant in the crime, but was involved from the beginning. He appeared at the house every day the victims were held there, and was present at the apartment in Los Angeles when the victims were first moved there. Further, as the trial court pointed out, [petitioner] was not merely involved in a scheme to smuggle people across the border, but to hold them captive when they did not have the money to pay. This was a sophisticated crime. Moreover, [petitioner] threatened one of the victims with death, and told her that her body would be disposed of in the desert. This is very serious conduct. [¶] [Petitioner] also contends that his sentence is disproportionate because he has no criminal record. While it is true that [petitioner] has no record, as the trial court stated: "If he had not done this before, he sure took to it like a duck tossed in a pond." [¶] [Petitioner's] sentence is not so disproportionate to his crimes that it shocks the conscience and

---

9. Grounds One and Seven raise ineffective assistance of counsel claims, which the Court addresses last.

offends fundamental notions of human dignity. It does not violate the constitutional prohibitions against cruel and unusual punishment.

Motion, Exh. C at 43–44.

 "The threshold determination in the eighth amendment proportionality analysis is whether [petitioner's] sentence was one of 'the rare case[s] in which a ... comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" *United States v. Bland*, 961 F.2d 123, 129 (9th Cir.) (quoting *Harmelin*, 501 U.S. at 1005, 111 S.Ct. at 2707 (Kennedy, J., concurring)), *cert. denied*, 506 U.S. 858, 113 S.Ct. 170, 121 L.Ed.2d 117 (1992); *United States v. Meiners*, 485 F.3d 1211, 1213 (9th Cir. 2007) (per curiam). This is not one of those cases. Rather, federal courts have upheld the imposition of life sentences in similar circumstances where, as here, the kidnappings were marked by threats of violence although no physical harm was actually inflicted on the victims. *See* e.g., *Eckert v. Tansy*, 936 F.2d 444, 445, 448–50 (9th Cir.1991) (two consecutive life sentences for first-degree kidnapping is not cruel and unusual punishment where weapon was used to commit the kidnappings and defendant threatened victims with death); *United States v. Anderson*, 561 F.2d 1301, 1302–03 (9th Cir.) (per curiam) (concurrent life sentences for kidnapping a mother and son, after defendant approached them with gun in his hand, does not constitute cruel and unusual punishment), *cert. denied*, 434 U.S. 943, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *United States v. Bondurant*, 555 F.2d 1328, 1329 (5th Cir.) (per curiam) (life imprisonment for kidnapping a four-year-old girl and transporting her interstate did not constitute cruel and unusual punishment when victim was physically uninjured), *cert. denied*, 434 U.S. 871, 98 S.Ct. 215, 54 L.Ed.2d 150 (1977); *Hess v. United States*, 254 F.2d 578, 585 (8th Cir.1958) (life imprisonment for kidnapping for ransom where victims were unharmed was not cruel and unusual punishment); *cf. Solem v. Helm*, 463 U.S. 277, 292–93, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983) ("[N]onviolent crimes are less serious than crimes marked by violence or the threat of violence."); *Taylor*, 460 F.3d at 1100 (same); *Bates v. Johnston*, 111 F.2d 966, 967 (9th Cir.) ("Kidnaping is a heinous offense. A sentence to life imprisonment for transporting a kidnaped victim in interstate commerce, or for conspiracy so to transport a kidnaped person, is not, in our opinion, cruel and unusual punishment within the constitutional inhibition (Const. Amend. 8)." (citation and internal quotation marks omitted)), *cert. denied*, 311 U.S. 646, 61 S.Ct. 17, 85 L.Ed. 412 (1940). Here, petitioner angrily told Judith that if she tried to leave, he, Cosio, and Beltran would kill her and throw her in the desert, and Beltran threatened to hit Janet with a belt if she did not sit down. Reporters' Transcript ("RT") 79:15–27, 115:5–14, 125:24–126:23, 128:8–15. Additionally, Beltran had a gun in his waistband when the three victims were in the house in El Monte and the victims were told there was a submachine gun inside a tote bag in the Los Angeles apartment the victims were put into initially. RT 121:7–17, 128:16–129:2. Moreover, as the California Court of Appeal found, petitioner was not a minor participant in the scheme to hold Janet, Judith, and Alexander captive: he drove the van in which the victims were transported from Calexico to El Monte, RT 57:10–58:12, 114:19–115:24; he was in the El Monte house every day during the approximately three days the victims were held there, RT 122:5–13; he was in the house before and after the trip to the 7–11, and was inside the first Los Angeles apartment when the victims arrived there, RT 70:16–28, 74:12–25, 127:23–128:7; he told Janet, Judith, and Alexander that they

were not free to leave, RT 75:7–76:5; and he threatened to kill Judith. RT 125:24–126:23. *See Eckert,* 936 F.2d at 448 ("When measuring the gravity of the offense, we consider the actual harm caused or threatened during the crime as well as the [petitioner's] culpability in committing it." (citations omitted)); *Cocio v. Bramlett,* 872 F.2d 889, 892 (9th Cir.1989) ("The type of harm threatened or caused and the level of the defendant's culpability determine the gravity of the offense.").

Thus, petitioner's sentence does not violate the Eighth Amendment. *Eckert,* 936 F.2d at 448–50; *Anderson,* 561 F.2d at 1302–03; *see also Harmelin,* 501 U.S. at 994–96, 1002–03, 111 S.Ct. at 2701–02, 2705–06 (imposition of mandatory sentence of life in prison without possibility of parole for possession of more than 650 grams of cocaine does not constitute cruel and unusual punishment even though defendant had no prior felony convictions). Accordingly, the California Supreme Court's denial of Ground Two was neither contrary to, nor an unreasonable application of, clearly established federal law, within the meaning of 28 U.S.C. § 2254(d).

## VII

■ In Ground Three, petitioner claims the prosecutor's failure to disclose that the prosecution witnesses had been induced to testify based on promises they could remain in the United States and not be deported prevented him from receiving a fair hearing. In Ground Four, petitioner claims "[n]ewly discovered evidence of perjury by critical prosecution witness(es)"—namely the declarations allegedly executed by the sisters, Judith and Janet Renteria, and Joel Salcedo,[10] in which Judith and Janet purportedly recant some of their testimony—shows petitioner was deprived of a fair trial and there can be no confidence in his conviction. *Id.* at 6k–*l.* These claims are without merit.

The purported declarations upon which petitioner relies were obtained after petitioner's trial by co-defendant Cosio. Petition, Exh. A. In their declarations, Judith and Janet claim Cosio never threatened them with any violence or held them against their will. *Id.* Additionally, Judith and Janet declare they testified untruthfully in Cosio's trial to curry favor with the immigration authorities, stating:

> During the trial, I was confused and was very scared at that moment and thought that if I testified against Arnoldo [sic] Cosio, (aka Mono) I would not be deported to Mexico. After living through such a horrifying experience, I testified on the stand against Arnoldo [sic] Cosio, (aka Mono) out of anger. I was enraged, confused and mentally disturbed on the stand. My testimony in trial was based on the circumstances which around me [sic]. Arnoldo [sic] Cosio, (aka Mono) like me, had just arrived to the United States a few days prior.

*Id.* In the third declaration, both Janet and Joel Salcedo state that "[o]n June 15, 2000

---

10. The purported declarations are in Spanish with English "translations" attached. However, the translations are not by certified interpreters, or any identified person; thus, they are not properly authenticated and, as such, are inadmissible in this proceeding. *See Jack v. Trans World Airlines, Inc.,* 854 F.Supp. 654, 659 (N.D.Cal.1994) ("Witness testimony translated from a foreign language must be properly authenticated and any interpretation must be shown to be an accurate translation done by a competent translator.").

Nevertheless, for the purpose of this opinion, the Court will assume *arguendo* the "translations" are accurate. Regarding the English "translations" of the two sisters' declarations, the Court notes the translations are identical except for the headings, the name of the declarant, and the last line. Although both sisters declare they were 16 at the time of Cosio's trial, that is not so. *See* Evidentiary Hearing Reporter's Transcript ("EHRT") at 53:22–26 (Janet was approximately 22 years old at the time of Cosio's trial).

the Immigration officer told us that we (Judith and Janeth [sic] Renteria) were going to be allowed to remain in the United States and that we would not be deported if we agreed to testify against the defendants." *Id.* Additionally, in the same declaration, Joel declares he had a conversation with Deputy District Attorney Fernando Guzman prior to the preliminary hearing and Guzman told him not to say anything about the promise made to the sisters (Judith and Janet) by the immigration authorities " 'or else the whole case [would] fall apart.' " *Id.*

## A. Ground Three:

 The prosecution's willful or inadvertent suppression of evidence favorable to the accused violates due process when the evidence is material to guilt or punishment, *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), whether the evidence is exculpatory or impeaching. *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia,* 547 U.S. 867, 870, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006) (per curiam) (citations and internal quotation marks omitted); *Strickler,* 527 U.S. at 280, 119

S.Ct. at 1948. The petitioner has the "burden of showing that withheld evidence is material [,]" *United States v. Si,* 343 F.3d 1116, 1122 (9th Cir.2003); *United States v. Zuno–Arce,* 44 F.3d 1420, 1425 (9th Cir.), *cert. denied,* 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995), and this Court must assess whether the withheld evidence is material "in the context of the entire record." [11] *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976); *United States v. Jernigan,* 492 F.3d 1050, 1054 (9th Cir.2007) (en banc).

On June 13–14, 2005, the Los Angeles County Superior Court held a consolidated evidentiary hearing for petitioner, Beltran and Cosio. *See* EHRT 1:18–246:18. Judith and Janet Renteria, Deputies District Attorney James Daloisio and Guzman,[12] Detective Rafael Batres,[13] and Carol Altamirano [14] testified at the evidentiary hearing. *Id.* The trial court found Altamirano's credibility to be "greatly suspect." EHRT 240:11–241:25. The trial court also found Janet and Judith were credible witnesses. EHRT 239:22–240:18. With respect to Judith and Janet's declaration, however, the Superior Court found:

> [T]here is a strong probability that documents presented in court, the affidavits, of the two young ladies, in fact, were not signed at least in their final form. [¶] As to the supplemental, . . . the young lady, Janet[ ], said, I don't even think

**11.** There is no separate "harmless error" analysis for *Brady* violations since " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.' " *Kyles v. Whitley,* 514 U.S. 419, 435–36, 115 S.Ct. 1555, 1566–67, 131 L.Ed.2d 490 (1995) (citations and internal quotation marks omitted); *Singh v. Prunty,* 142 F.3d 1157, 1159 n. 5 (9th Cir.), *cert.*

*denied,* 525 U.S. 956, 119 S.Ct. 388, 142 L.Ed.2d 321 (1998).

**12.** Mr. Daloisio prosecuted petitioner's preliminary hearing and Mr. Guzman prosecuted the trials against Beltran, Cosio and Jose Ponseca.

**13.** Mr. Batres is the El Monte police officer who investigated the kidnappings.

**14.** Ms. Altamirano is the relative of Cosio's who obtained the declarations that were the focus of the evidentiary hearing.

that's my signature on there. These things [cast] grave doubts on the veracity of the information contained in the documents. I mean, she was so unconcerned—"she" being Ms. Altamirano—so unconcerned about the truth, that she didn't even take steps to proofread these things. [¶] She got them both being age 16. She used mirror-not even a mirror image, the exact same declaration for both of the young ladies without even talking to the second one, that's according to her testimony. So I feel that there are grave doubts that the young ladies even signed the declarations that have made their way to court.

EHRT 241:17–25. Finally, the Superior Court found it could not draw any inference that there was an agreement to allow Judith and Janet to remain in the country indefinitely in exchange for their testimony. EHRT 237:4–22, 242:24–243:1. Specifically, the Superior Court determined:

In terms of an agreement, here's what the agreement was. It was a tacit one that was understood by all parties, to wit, the young ladies wouldn't ... be[ ] deported **until the trial was over.** That was obvious to every counsel in the case it seems to me ..., including defense attorneys. The young ladies were not in custody. They were in the United States at the court proceedings. They had not been deported, certainly as of the conclusion of the second trial. [¶] So it was real clear that, certainly, there was this understanding that they wouldn't be. If they were going to be, they would have been in custody, or they would have already been deported and back here in some sort of a situation making it an appearance that had occurred.... [¶] **But the state of the evidence is that at a minimum every-**

one knew the girls had not been deported. That they weren't going to be until the case was over. And, further, that they had been promised that they wouldn't be prosecuted for somehow taking part in this initial scheme to get into the country illegally as arguably they would have been reliable [sic], perhaps, as co-conspirators, I don't know. But those were certainly the deals.

\* \* \*

All you've proved is that they didn't deport them, because they needed witnesses, and they weren't going to be deported until they testified.

EHRT 241:26–244:4. The Superior Court concluded:

[S]ince there was no deal, you don't even really get to the second portion[ ] of the *Brady* issue, which is, did the D.A. know about it and hide it, and was it material. There was no deal you haven't proven the first portion of it and, certainly, haven't proven the prosecutor was aware of any such situation, again. And all the testimony we have is quite to the contrary.

EHRT 244:6–12.

 Here, petitioner has failed to rebut the Superior Court's factual findings by clear and convincing evidence,[15] 28 U.S.C. § 2254(e)(1), and this Court must defer to the Superior Court's credibility findings. *See Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983) (Section 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Sophantha-*

---

**15.** Petitioner attempts to rebut the Superior Court's findings by relying on inadmissible or irrelevant evidence, including the "joint dec-laration" of Sandra and Carol Altamirano, which is replete with inadmissible hearsay. Fed.R.Evid. 801–07.

*vong v. Palmateer,* 378 F.3d 859, 867 (9th Cir.2004) ("Here, because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings." (citations omitted)). As such, petitioner's *Brady* claim is without merit. Rather, as the Superior Court found, all counsel, including defense counsel, knew the witnesses were to stay in the United States while testifying at petitioner's trial. *See Strickler,* 527 U.S. at 281–82, 119 S.Ct. at 1948 (The government's suppression of evidence is a necessary element of a *Brady* claim); *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) (same).

**Ground Four:**

■■■ "[A] habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997)(en banc), *cert. denied,* 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); *Osborne v. Dist. Attorney's Office for the Third Judicial Dist.,* 521 F.3d 1118, 1130–31 (9th Cir.2008). In Ground Four, petitioner claims newly discovered evidence of "perjured" testimony, thereby suggesting he is innocent of the crimes of which he was convicted.[16] The respondent, however, addresses Ground Four as a prosecutorial misconduct claim, arguing petitioner "did not meet his burden to demonstrate the prosecution knowingly presented false testimony." Answer at 24:3–26:3. However, this is not the correct characterization of petitioner's claim since petitioner does not assert the prosecutor knowingly presented the perjured testimony.

■■■ Giving due deference to the Superior Court's findings of fact and credibility determinations at the evidentiary hearing, as detailed above, petitioner has not shown perjured testimony played any part in his conviction, *Cook v. Schriro,* 516 F.3d 802, 819 (9th Cir.2008), and certainly has not shown his actual innocence of the crimes of which he was convicted. *Jackson v. Calderon,* 211 F.3d 1148, 1165 (9th Cir.2000), *cert. denied,* 531 U.S. 1072, 121 S.Ct. 764, 148 L.Ed.2d 665 (2001); *Carriger,* 132 F.3d at 476.

Accordingly, the California Supreme Court's denial of Grounds Three and Four was neither contrary to, nor an unreasonable application of, clearly established fed-

**16.** "[I]t is presently an open question" in the Supreme Court whether "a freestanding actual innocence claim is ... cognizable under federal law[,]" and, if so, "whether there should be a distinction between capital and non-capital cases...." *Osborne,* 521 F.3d at 1130; *see also House v. Bell,* 547 U.S. 518, 554–55, 126 S.Ct. 2064, 2086–87, 165 L.Ed.2d 1 (2006) (declining to resolve whether freestanding actual innocence claim can be maintained); *Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993) (assuming without deciding "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim"). As such, a state court's rejec-tion of a freestanding actual innocence claim cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Stenson,* 504 F.3d at 881 ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law."); *Stevenson v. Lewis,* 384 F.3d 1069, 1071 (9th Cir.2004) ("If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law."), *cert. denied,* 543 U.S. 1191, 125 S.Ct. 1408, 161 L.Ed.2d 197 (2005).

eral law, within the meaning of 28 U.S.C. § 2254(d).

## VIII

 A faulty jury instruction will constitute a violation of due process only where the instruction by itself so infected the entire trial that the resulting conviction violates due process. *Middleton v. McNeil,* 541 U.S. 433, 437, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004); *Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). The instruction must be more than merely erroneous; rather, petitioner must show there was a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.' " *McNeil,* 541 U.S. at 437, 124 S.Ct. at 1832 (citations omitted); *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *see also Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which [an allegedly faulty] instruction was used, it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire,* 502 U.S. at 72, 112 S.Ct. at 482 (citation omitted); *Naughten,* 414 U.S. at 147, 94 S.Ct. at 400.

 The Sixth and Fourteenth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin,* 515 U.S. 506, 509–10, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995); *see also In re Winship,* 397

U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute. the crime with which he is charged."). "Jury instructions relieving States of this burden violate a defendant's due process rights." *Carella v. California,* 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989) (per curiam); *Francis v. Franklin,* 471 U.S. 307, 326, 105 S.Ct. 1965, 1977, 85 L.Ed.2d 344 (1985); *see also Evanchyk v. Stewart,* 340 F.3d 933, 939 (9th Cir.2003) ("It is a violation of due process for a jury instruction to omit an element of the crime."), *cert. denied,* 541 U.S. 1067, 124 S.Ct. 2399, 158 L.Ed.2d 971 (2004); *Ho v. Carey,* 332 F.3d 587, 592 (9th Cir.2003) ("When a jury instruction omits a necessary element of the crime, constitutional error has occurred.").

 Moreover, a criminal defendant is entitled to have the trial court instruct the jury on his theory of defense, provided the theory is supported by law and has some foundation in the evidence. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988); *Bradley v. Duncan,* 315 F.3d 1091, 1098 (9th Cir.2002), *cert. denied,* 540 U.S. 963, 124 S.Ct. 412, 157 L.Ed.2d 305 (2003). However, where the alleged error in instructing the jury is the failure to give an instruction, the burden on the petitioner is "especially heavy." *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977); *Clark v. Brown,* 450 F.3d 898, 904 (9th Cir.), *cert. denied,* —— U.S. ——, 127 S.Ct. 555, 166 L.Ed.2d 423 (2006).

 In Ground Five, petitioner claims the trial court violated his constitutional rights by failing to instruct the jury that lack of consent is an element of the crime of kidnapping for ransom under P.C.

§ 209(a), and in Ground Six, petitioner claims the trial court's refusal to instruct on his theory of the case—his reasonable and good faith mistake as to the victims having consented to kidnapping for ransom-violated his right to due process.[17] These claims are without merit.

■■■ Consent is not an element of kidnapping for ransom under P.C. § 209(a),[18] but instead, is a complete defense to the charge. *People v. Mayberry*, 15 Cal.3d 143, 154–58, 125 Cal.Rptr. 745, 752–55, 542 P.2d 1337 (1975); *see also People v. Isitt*, 55 Cal.App.3d 23, 28, 127 Cal.Rptr. 279 (1976) ("[T]he defendant's reasonable good faith belief that the victim has voluntarily consented to accompany him constitutes a complete defense to the charge of kidnapping."). At petitioner's trial, the trial court instructed with CALJIC no. 9.53, defining kidnapping for ransom as follows:

Defendant is accused in Counts 2, 3, and 4 of having violated section 209, subdivision (a) of the Penal Code, a crime. [¶] Every person who seizes, confines, conceals, carries away, holds, or detains another person by any means whatsoever with the specific intent to hold or detain that person for ransom, or to exact from another any money or valuable thing, is guilty of a violation of Penal Code section 209[ (a) ], a crime. [¶] It is not essential to that crime that the person be carried or otherwise moved for any distance, or at all. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person was seized, confined, concealed, carried away, held, or detained; and [¶] 2. The seizing, confining, concealment, carrying away, holding, or detention of that person was done with the specific intent to hold or detain that

---

**17.** Respondent raises *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) as a bar to Ground Six. Answer at 30–33. The *Teague* doctrine is a "nonretroactivity principle" that "prevents a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994); *Horn v. Banks*, 536 U.S. 266, 271, 122 S.Ct. 2147, 2150, 153 L.Ed.2d 301 (2002). If the *Teague* doctrine is "properly raised by the state," a federal court must conduct a threshold *Teague* analysis prior to considering the merits of a petitioner's challenged claim. *Banks*, 536 U.S. at 272, 122 S.Ct. at 2151; *Bohlen*, 510 U.S. at 389, 114 S.Ct. at 953. Here, however, respondent's *Teague* defense is specious since Ground Six is not, as respondent suggests, a claim that petitioner has the right to have the jury instructed in whatever manner he wishes, but rather, that he was deprived of due process of law because the trial court did not give instructions on petitioner's theory of defense—a well-recognized due process claim. *See*, e.g., *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984) ("Under the Due Process

Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."); *Bradley*, 315 F.3d at 1098–1101 (Supreme Court has clearly established the "right to present a complete and meaningful defense to the jury," which includes the right to have the jury instructed on the defense theory of the case, "under the principles set out in *Mathews* and *Trombetta*.").

**18.** P.C. § 209(a) provides, in pertinent part:

Any person who ... kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony, and upon conviction thereof, ... shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm.

Cal.Penal Code § 209(a) (2000).

person for ransom, or to obtain something of value from another.

CT 215. The trial court also instructed the jury under CALJIC no. 9.55 that "[w]here a person is charged with the crime of kidnapping for the purpose of ransom, it is not necessary to establish that this purpose was accomplished. The crime is complete if the kidnapping is done for that purpose." CT 216.

 The petitioner, however, did **not** request the trial court instruct the jury regarding consent as a defense to kidnapping. RT 482:26–485:9. In California, a trial court has a duty to instruct sua sponte on a particular defense "if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." *People v. Maury*, 30 Cal.4th 342, 424, 133 Cal.Rptr.2d 561, 631, 68 P.3d 1 (2003), *cert. denied*, 540 U.S. 1117, 124 S.Ct. 1058, 157 L.Ed.2d 909 (2004) (citations and internal quotation marks omitted); *People v. Abilez*, 41 Cal.4th 472, 517, 61 Cal.Rptr.3d 526, 564, 161 P.3d 58 (2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 720, 169 L.Ed.2d 563 (2007). Here, petitioner's theory of defense was that he was **not** involved in any kidnapping at all, and "just like" the victims, he "needed a ride" so he "hussled [sic] a fee arrangement to pay less money by working it off in labor as a driver"; thus, he was not a kidnapper. *See,* e.g., RT 488:25–513:12. To that end, petitioner

took the stand in his own defense, and on the stand, he did not testify that he believed the victims had consented to remain with him, or their captors, until money was paid for their release.[19] RT 292:19–380:27, 457:3–461:16. Therefore, petitioner did not rely on consent as the theory of his defense, and the evidence did not support the giving of a consent instruction. *Solis v. Garcia*, 219 F.3d 922, 929–30 (9th Cir. 2000), *cert. denied*, 534 U.S. 839, 122 S.Ct. 94, 151 L.Ed.2d 55 (2001); *see also People v. Greenberger*, 58 Cal.App.4th 298, 375, 68 Cal.Rptr.2d 61 (1997) (trial court properly refused to instruct jury with CALJIC nos. 9.56 and 9.58 when instructions were not supported by the evidence presented).

 In any event, even if the instruction petitioner now seeks had been given, it would not have aided petitioner since the jury specifically found the victims were "confined … against their will[,]" CT 232, and thus, did not consent to their restraint; therefore, any instructional error in this regard did not have a substantial and injurious effect or influence on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993). Indeed, the Ninth Circuit reached the same conclusion with regard to Beltran, stating "[t]he jury's express finding that the victims were confined against their will necessarily implied that the victims had not consented. Thus, any error in the trial court's instruction on consent was harmless." *Beltran v. Roe*, 111 Fed.

---

19. Indeed, the following exchange occurred on crossexamination of petitioner:

Q. The idea of holding three young people against their will for money, do you find that whole notion offensive?
A. I have never detained anyone.
\* \* \* \*
Q. And you knew they were being held against their will.
A. They never said anything to me about that.

\* \* \* \*
Q. And until they paid, they were not free to leave.
A. I don't know what their agreement with the other people was. If that was the agreement, that they would leave after they paid, that was not my problem. It was not my business. [¶] I never spoke to them about that.
RT 366:10–367:21.

Appx. 970, 971 (9th Cir.2004) (Unpublished Disposition), *cert. denied,* 544 U.S. 966, 125 S.Ct. 1739, 161 L.Ed.2d 611 (2005).

Accordingly, the California Supreme Court's denial of Grounds Five and Six was neither contrary to, nor an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d).

## IX

To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must demonstrate his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The petitioner bears the burden of establishing both components. *Williams,* 529 U.S. at 390–91, 120 S.Ct. at 1511–12; *Smith v. Robbins,* 528 U.S. 259, 285–86, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000). "Deficient performance is performance which is objectively unreasonable under prevailing professional norms." *Hughes v. Borg,* 898 F.2d 695, 702 (9th Cir.1990) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064). Prejudice "focuses on the question whether counsel's deficient performance renders the results of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993); *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17.

To establish deficient performance, petitioner must show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Williams,* 529 U.S. at 391, 120 S.Ct. at 1511. In reviewing trial counsel's performance, the court will "strongly presume[ ] [that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003). Only if counsel's acts and omissions, examined within the context of all the surrounding circumstances, were outside the "wide range" of professionally competent assistance, will petitioner meet this initial burden. *Morrison,* 477 U.S. at 386, 106 S.Ct. at 2588; *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2068.

If petitioner makes this showing, he must then establish there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Williams,* 529 U.S. at 391, 120 S.Ct. at 1511–12. The errors must not merely undermine confidence in the outcome of the trial, but must result in a proceeding that was fundamentally unfair. *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17; *Lockhart,* 506 U.S. at 369, 113 S.Ct. at 842–43. However, the Court need not determine whether counsel's performance was deficient before determining whether the defendant suffered prejudice as the result of the alleged deficiencies. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."); *Smith,* 528 U.S. at 286 n. 14, 120 S.Ct. at 764 n. 14 (same).

The standards for determining whether trial counsel was ineffective also apply to determining whether appellate counsel was ineffective, *Smith,* 528 U.S. at 285, 120 S.Ct. at 764; *Turner v. Calderon,* 281 F.3d 851, 872 (9th Cir.2002), and petitioner bears the burden of establishing

both components of the *Strickland* standard, i.e., "that counsel's advice fell below an objective standard of reasonableness, ... and that there is a reasonable probability that, but for counsel's unprofessional errors, [the petitioner] would have prevailed on appeal." *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989); *Cockett v. Ray,* 333 F.3d 938, 944 (9th Cir.2003).

 In reviewing appellate counsel's performance, the Court will presume appellate counsel used reasonable tactics; otherwise, it "could dampen the ardor and impair [counsel's] independence ..., discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Pollard v. White,* 119 F.3d 1430, 1435 (9th Cir.1997) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065). Appellate counsel has no constitutional duty to raise every issue, where, in the attorney's judgment, the issue has little or no likelihood of success. *Jones v. Barnes,* 463 U.S. 745, 751–53, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983) (limited on other grounds in *Robbins,* 528 U.S. at 287, 120 S.Ct. at 765); *Turner,* 281 F.3d at 872. Indeed, as an officer of the court, appellate counsel is under an ethical obligation to refrain from wasting the court's time on meritless arguments. *McCoy v. Court of Appeals of Wisconsin,* 486 U.S. 429, 436, 108 S.Ct. 1895, 1900, 100 L.Ed.2d 440 (1988).

**Ground One:**

In Ground One, petitioner claims his trial counsel was ineffective in failing to object to the prosecutor's reference to the co-conspirators' convictions. The facts underlying this claim are as follows: During his opening statement, the prosecutor stated:

> You have three other defendants in this case. [¶] Defendant Jose Beltran. [¶] Defendant Jose Fonseca [ ¶ ] And defendant Arnoldo Rocio [sic][¶] These three

individuals, Jose Beltran, Jose Fonseca and Arnoldo Rocio [sic] were all convicted by a jury in January of this year of the exact same charges. [¶] So these three individuals have already been convicted of these exact same crimes. [¶] All that is left is Francisco Fonseca. RT 38:15–27. Defense counsel did not object. The prosecutor concluded his opening statement by stating:

> At the end of the trial you will see that there is more than enough evidence to convict Cho Cho [petitioner] here of all the crimes he committed and he can join his three other buddies that [sic] were convicted last January.

RT 51:25–52:1. Again, defense counsel did not object. Finally, prior to closing arguments, the prosecutor requested the trial court take judicial notice of the court files for Beltran, Cosio, and Jose Fonseca. RT 463:17–22. This time, defense counsel objected, and the trial court sustained the objection, stating:

> People, what you are seeking to do is not lawful, plainly stated.[¶] On occasion, what you can do is admit into evidence a guilty plea of a co-defendant. It is a declaration against interest. [¶] What you can never do is put a jury finding of guilt as to a co-defendant. [¶] It is not relevant any more, as counsel points out, than a not guilty finding would be. [¶] It does not tell us a darn thing except that that jury for reasons of their own convicted those people. [¶] It would make the jury assume that that case was a strong case and you cannot do that. [¶] You don't have the identity of parties, so you cannot say that they found a conspiracy existed beyond a reasonable doubt so we would like to use that finding here. [¶] There is no way that evidence comes in. [¶] That is why it was surprising that you made reference to it in your opening statement, and I

was doubly surprised when I did not hear an objection. [¶] I think what you best do is leave that alone. [¶] It has been—[¶] The jury has been told, as counsel points out. [¶] He did not object for his reasons. [¶] Do not argue it or make any reference to it.

RT 464:16–465:21.

The California Court of Appeal considered petitioner's ineffective assistance of counsel claim, and denied the claim, holding:

Here, it might have been sound trial strategy for [petitioner's] counsel to object to the prosecutor's statements, but this was not the only sound strategy available to him. Counsel's decision to wait until the prosecution sought to introduce actual evidence of the convictions, then to object to that evidence was an equally sound strategy. By not objecting to the statements, counsel did not draw further attention to [them]. Further, by not objecting, counsel let the prosecutor make a promise of proof to the jury which he could not fulfill. The choice between such sound strategies is particularly in the province of trial counsel and not this court. [¶] Further, even assuming that [petitioner's] counsel should have objected during the opening statement, his failure to do so does not undermine our confidence in the verdict. The evidence of [petitioner's] involvement in the kidnappings was strong, and we see no reasonable probability that [petitioner] would have obtained a more favorable outcome if his counsel had objected. The Renterias positively identified [petitioner] as the man who drove them from the border to the house in El Monte. They testified that he was at the house in El Monte every day that they were held captive, and was waiting at the house when Rocio [sic], Beltran and Jose Fonseca brought the Renterias back to the house after the ransom exchange failed. Ju-

dith Renteria testified that, upon her return to the house, [petitioner] told her that she would be killed and her body thrown in the desert. The Renterias also testified that when they were moved from the house to the apartment in Los Angeles, [petitioner] was in the apartment when they arrived. Given this evidence, we see no reasonable probability that the jury found [petitioner] guilty by association with the previously-convicted Rocio [sic], Beltran and Jose Fonseca. [fn 2]

[fn 2] Our conclusion is bolstered by the fact that the trial court instructed the jury that statements made by the attorneys were not evidence, and that no evidence of the others' convictions was ever introduced.

Motion, Exh. C at 39–40.

As the Court of Appeal held, defense counsel may have reasonably decided not to object to the prosecutor's opposing comments about co-defendants in order to deemphasize their convictions, and to allow the jury to believe the prosecution was making a promise it could not fulfill, thereby discrediting the prosecution. *See, e.g.,* *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (citation and internal quotation marks omitted)); *United States v. Necoechea,* 986 F.2d 1273, 1281 (9th Cir.1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."); *Werts v. Vaughn,* 228 F.3d 178, 204 (3d Cir.2000) (defense counsel's failure to object to remark in prosecutor's opening statement was reasonable trial strategy since counsel "did not want to draw attention to it by continuously objecting to it" and reason-

ably concluded the remark could "back-fire" against the prosecutor), *cert. denied,* 532 U.S. 980, 121 S.Ct. 1621, 149 L.Ed.2d 483 (2001). Thus, defense counsel was not ineffective in failing to object to the prosecution's references in his opening statement.

Moreover, the trial court instructed the jury that statements attorneys make are not evidence, CT 184, and "[a] jury is presumed to follow its instructions." *Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000); *Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993). Given the nature and strength of the evidence against petitioner, even if defense counsel was ineffective in failing to object to the prosecutor's references in his opening statement, petitioner has not established prejudice from defense counsel's failure. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Allen v. Woodford,* 395 F.3d 979, 999–1000 (9th Cir.), *cert. denied,* 546 U.S. 858, 126 S.Ct. 134, 163 L.Ed.2d 137 (2005).

**Ground Seven:**

In Ground Seven, petitioner raises a number of ineffective assistance of defense counsel and appellate counsel claims, all of which are uniformly without merit. First, petitioner claims (Grounds 7(a) and (e)) defense counsel and appellate counsel were ineffective in failing to raise all claims raised herein. Yet, all of petitioner's claims are without merit; thus, Grounds 7(a) and (e) necessarily fail. *See,* e.g., *Turner,* 281 F.3d at 872 ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."); *Wildman v. Johnson,* 261 F.3d 832, 840 (9th Cir.2001) ("[Petitioner] cannot sustain his claim for ineffective assistance of appellate counsel because the issues he raises are without merit").

Next, petitioner claims defense counsel was ineffective for "failing to [make] a sufficiently specific request for discovery from the prosecution of inducements to the prosecution witnesses to testify." Once again, petitioner is referring to the alleged agreement allowing the sisters to stay in the United States indefinitely in exchange for testifying for the prosecution. As discussed above, there is no factual basis for this claim; therefore, it is without merit. Similarly, petitioner's claim that defense counsel was ineffective in failing "to sufficiently investigate the prosecution witnesses to determine" false testimony and "that the witnesses had been told they would be allowed to remain in the U.S. free of INS interference ... in exchange for testimony favorable to the prosecution" has no factual basis.

Petitioner also claims counsel was ineffective in failing "to make a sufficiently tailored 'pinpoint' instruction on reasonable mistake of fact as to consent, as a defense to kidnapping for ransom." However, as discussed above, there is also no factual basis for this claim since petitioner's theory of defense was that he was not involved in any kidnapping.

Accordingly, the California Supreme Court's denial of Grounds One and Seven, and any other ineffective assistance of counsel claims, was neither contrary to, nor an unreasonable application of, clearly established federal law, within the meaning of 28 U.S.C. § 2254(d)(1).

**RECOMMENDATION**

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Final Report and Recommendation; (2) adopting the Final Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the First Amended Petition for writ of

habeas corpus and dismissing the action with prejudice.

July 16, 2008.