IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

PATRICK MCLEOD NISSLEY, *Appellant.*

No. 1 CA-CR 12-0780
FILED 10-20-2015

Appeal from the Superior Court in Maricopa County
No.  CR2011-110536-001
The Honorable Bruce R. Cohen, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist
*Counsel for Appellee*

Ballecer & Segal, LLP, Phoenix
By Natalee E. Segal
*Counsel for Appellant*

**OPINION**

Judge Samuel A. Thumma delivered the opinion of the Court, in which Presiding Judge Lawrence F. Winthrop joined and Judge Kenton D. Jones dissented in part.

**T H U M M A**, Judge:

¶1        Patrick McLeod Nissley appeals from his convictions and resulting sentences for reckless manslaughter, possession or use of narcotic drugs and four counts of endangerment. Nissley argues the superior court erred in denying his motion to suppress blood test results for blood obtained for law enforcement purposes under Arizona Revised Statute (A.R.S.) section 28-1388(E) (2015).[1] Because Nissley has shown no reversible error, his convictions and sentences are affirmed as modified to vacate the requirement that Nissley pay for the cost of his DNA testing.

## FACTS[2] AND PROCEDURAL HISTORY

¶2        Shortly after 5:30 p.m. on November 2, 2010, while driving his car at a high rate of speed in a residential area, Nissley crashed head on into an oncoming car, injuring four people in the oncoming car and killing a pedestrian. Witnesses later detailed Nissley's erratic and dangerous driving and behavior leading up to and after the fatal crash. A blood sample taken from Nissley by medical personnel at a hospital less than an hour later revealed significant concentrations of methamphetamine and an active metabolite of heroin in his system at the time of the crash. The State charged Nissley with one count of second degree murder, a Class 1 dangerous felony; one count of possession or use of narcotic drugs, a Class 4 felony; and four counts of endangerment, each a Class 6 dangerous felony.

¶3        Nissley moved to suppress the blood test results, asserting the blood sample was obtained without a warrant or probable cause and that he expressly refused medical treatment. Nissley argued that

> [a police] officer cannot obtain blood for law enforcement purposes pursuant to A.R.S. § 28-1388(E) when the person is subjected to medical treatment that the person has expressly rejected.

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

[2] This court considers only the evidence received at the suppression hearing and does so in a light most favorable to upholding the superior court's ruling on the motion to suppress. *See, e.g., State v. Blackmore*, 186 Ariz. 630, 631, 925 P.2d 1347, 1348 (1996*); State v. Hyde*, 186 Ariz. 252, 265, 921 P.2d 655, 668 (1996).

> In *State v. Estrada*, 209 Ariz. 287, 100 P.3d
> 452 ([App.] 2004), this precise question was
> answered. There, similar circumstances
> resulted in law enforcement obtaining a sample
> of blood drawn from an individual who
> expressly refused medical treatment. The Court
> held the blood inadmissible on the same theory
> raised in this case.

The State's response argued that the facts were "distinguishable from the *Estrada* case relied upon by [Nissley] as the basis for his motion to preclude the blood test results." In reply, relying on *Estrada*, Nissley claimed that if the "suspect actively rejects medical treatment, then the police may no longer exploit" A.R.S. § 28-1388(E).

## I.      The Evidentiary Hearing.

¶4         At the evidentiary hearing on Nissley's motion to suppress, the superior court heard testimony from six witnesses, received numerous exhibits and heard argument. Nissley, as was his right, elected not to testify at the hearing. The evidence received addressed the issues raised in Nissley's motion to suppress: (1) whether law enforcement had probable cause and (2) whether Nissley expressly refused medical treatment. Given the fact-intensive nature of the inquiry, the evidence is summarized here in some detail.

### A.      The Scene Of The Crash.

¶5         Officer Jay Jones was the first responder, arriving at the scene between 5:35 and 5:40 p.m. When he arrived, Nissley was being tended to by a concerned citizen who was a nurse. Jones testified Nissley appeared to be in distress, "was flailing around" and that his "whole car was crushed in around him."

¶6         Officer Deborah Hemshrot arrived a few minutes after Jones and heard Nissley screaming in his car. When Hemshrot told Nissley to "stop it," he complied. Hemshrot testified there was a great deal of blood in his car, which photographs confirm. Asked whether Nissley was "refusing assistance," Hemshrot testified "[n]ot that I'm aware of, no." She added that Nissley did not otherwise respond to her and was being uncooperative. Nissley was screaming and cursing, shoving and punching first-responders, nonresponsive to questions and apparently unable to understand what was happening. Hemshrot, who had been an emergency medical technician (EMT) for approximately 10 years before becoming a

police officer, testified, "[Nissley's] speech was slurred. I could not smell any alcohol or anything coming from his breath. But I could not make out what he was saying. He just had a – like he was on something. He was appearing to be delirious and just screaming."

¶7            Officer Nichole Hanson arrived at about the same time as Hemshrot and controlled traffic and took photographs. Hanson testified to seeing syringes in Nissley's car and an uncapped needle stuck between the car's windshield and dashboard.

¶8            Andrew McDonald, the primary treating paramedic, and EMT Aaron Lowery arrived after Hemshrot and Hanson. McDonald testified Nissley had numerous cuts, was bleeding and had scrapes to the face and head. Nissley's car had quite a bit of damage from an apparent rollover. McDonald asked Nissley for his name and general information to assess his condition. Nissley responded by stating "'f' off, leave me alone" and refused to provide any additional information. McDonald testified that Nissley's response to similar questions was profanity and "leave me alone, I'm fine" and "just go away." As McDonald was treating Nissley and "explaining to him that I was there to help him, I did, numerous times, tell him he had to give me information if he wanted me to go away," yet Nissley did not answer the questions asked and "never responded giving me any information." "At no time was [Nissley] able to provide any indication on his level of consciousness." McDonald added that Nissley "was aggressive, he was pushing [paramedics] away," and "[a]t a few points … attempted to strike us with a closed fist." Nissley "was physically combative during the entire event," including before McDonald asked him any questions.

¶9            McDonald expressed concern that Nissley may have suffered a closed head injury and testified that individuals who have closed head injuries act similarly to how Nissley was acting. McDonald testified that Nissley's behavior might be "consistent" with someone with a "closed head injury," although he conceded Nissley was "conscious" and "verbally responsive" and that Nissley "seemed to be like he knew what was going on. He knew the situation he was in, but he didn't want anybody around him, was my opinion."

¶10            When asked whether, at any point, Nissley said "I don't need medical treatment," McDonald testified "I don't recall him saying that." When asked if, at any point before being placed in the ambulance, Nissley "indicate[d] to you he didn't want to go to the hospital," McDonald answered "[h]is only indication was that he said, I didn't want your help, and that he continued to swear at us and act aggressive." McDonald

4

testified that, for Nissley "to say, leave me alone, did not indicate that he didn't want our medical treatment." According to McDonald, Nissley's refusal to cooperate "indicat[ed] that at that particular time he did not want anything from us." After removing Nissley from his car, McDonald treated him and Nissley continued cursing and being combative. McDonald testified Nissley kept "pushing us away" and "attempting to hit us with a closed fist." Once they "had him strapped to a back board which was then in turn strapped to a gurney," Nissley was "able to pull his feet out of the straps and attempt to kick at" the paramedics.

¶11 McDonald testified he did not believe Nissley ever said he wanted McDonald's assistance or treatment or transportation to the hospital. Given Nissley's injuries, however, McDonald testified he was unable to decline transporting Nissley to the hospital without getting clearance from a doctor. When asked "did it ever occur to you that, because this person was telling you he didn't want your help, that you were going to be transporting him against his will," McDonald responded "Yes." McDonald explained why, given his injuries, Nissley was transported to the hospital without a doctor being consulted:

> Q      And, I mean, isn't that when you're supposed to call the doctor at the hospital and say, we've got somebody that may not want our help? I think he needs it?
>
> A      Per our offline treatments, if they cannot respond to our alert and oriented questions, we don't have to call and get permission for that.
>
> Q      Aren't you making a distinction? You said, cannot respond. I mean, it's not that he couldn't respond. He just didn't respond. Isn't that the truth?
>
> A      He did not.
>
> Q      All right. So he could have responded?
>
> A      I don't know if he could or not. He did not respond to the questions I asked.
>
> Q      He was saying whatever the heck else he wanted to say, wasn't he?

A. He said quite a few things. I can't tell you if he could have or not. He didn't answer my questions.

¶12 EMT Lowery testified about significant damage to Nissley's car that appeared to be caused by a rollover, that Nissley had a head wound and had quite a bit of blood "all over" his head and there was blood in the car from his head wound. Lowery testified Nissley "did state to leave me alone, don't touch me," but he "would not answer our questions." Lowery said Nissley was "throwing punches, calling us names" and saying "I don't want your help." Lowery acknowledged Nissley was saying "no" to transportation to the hospital, but added that Nissley did not have the right to refuse transportation to the hospital in his condition. "He wasn't able to make his own decisions." Lowery testified that Nissley's behavior was not consistent with a diabetic who was hypoglycemic. Even if it had been, Lowery testified that he would not have left Nissley in the car. Lowery helped put Nissley on the backboard used to put him in the gurney to take him to the hospital and held his head down because responders suspected Nissley had a head or back injury. Lowery never heard Nissley say that he wanted to go to the hospital or "[p]lease give me medical assistance."

¶13 Officer Sara Plotnik arrived at the scene after the other first responders. She testified that Nissley, while "probably traveling at a high rate of speed, which would be unusual for that area due to the foot traffic" and the low speed limit, caused a head-on accident killing a pedestrian. Damage to Nissley's car, as evidenced by photographs of the scene, confirmed that Nissley had been driving fast. Plotnik never heard Nissley reject treatment but she did see him "moving around" continually "yelling ow, ow," while he was strapped to the gurney and the paramedics were trying to work on or move him. Plotnik testified Nissley was screaming and cursing, shoving and punching first-responders, nonresponsive to questions and apparently unable to understand what was happening. Based on her training and experience, Plotnik testified that Nissley's behavior was consistent with being under the influence of drugs or alcohol. She added that Nissley's behavior was inconsistent with someone who had simply been in an accident and more consistent with someone under the influence of drugs or alcohol. Plotnik recounted information provided to her at the time that "a lot of syringes were seen on the ground" and in Nissley's car, which photographs confirm.

## B.    The Ambulance Trip To The Hospital.

¶14    McDonald and Lowery rode with Nissley in the ambulance to the hospital. McDonald testified that Nissley continued to curse and be combative in the ambulance. McDonald did not recall Nissley saying he did not want to go to the hospital while he was in the ambulance, although Nissley continued to curse and was "extremely combative" during the ride and was pushing him away, swinging at him and kicking him the entire time. Lowery acknowledged that Nissley continued to be uncooperative and combative and was consistent throughout his contact with Lowery.

## C.    At The Hospital.

¶15    Nissley's first contact with nurses and doctors, which resulted in the blood draw, did not occur until after he arrived at the hospital. Plotnik was at the hospital when Nissley was being unloaded from the ambulance and testified that Nissley "was continually yelling ow, ow ow." Lowery, who wheeled Nissley into the hospital, testified that Nissley's blood was taken according to hospital protocol, not at Lowery's direction. Lowery testified that Nissley behaved the same way at the hospital as he did at the crash site and treated the nurses and doctors the same way he treated Lowery at the crash site.

¶16    Plotnik testified that, "[a]s hospital staff tried to work on [Nissley], he would continually move about." Plotnik testified that, at the hospital, Nissley continued to move or jump away, making it "difficult" for medical professionals to work on him. Plotnik testified Nissley had to be sedated before they could "assess his situation." When medical personnel asked questions, Nissley "said that he didn't know or he just refused to answer." When asked whether she "ever hear[d] Mr. Nissley tell the doctors [at the hospital], I don't want medical treatment," Plotnik responded "I never did."

¶17    Plotnik had a portable recorder at the hospital that she used to record some statements by medical personnel and Nissley, both as Nissley was unloaded from the ambulance and in the trauma room. At least portions of that recording were played at the suppression hearing. That recording, however, was not received as an exhibit, is not part of the record on appeal and no transcript from the recording is part of the record on appeal.

## II.     The Superior Court's Ruling On Nissley's Motion To Suppress.

¶18        After considering the evidence in the context of the parties' arguments, the superior court issued a detailed minute entry stating, in part:

> This Court has painstakingly reviewed the record to assess whether [Nissley's] actions rose to the level of "express rejection" of medical care contemplated by *Estrada*. In so doing, the Court has not only weighed the presentation of the various witnesses, but also the tape recording secured by Officer Plotnik at the hospital. Throughout the recording, there were numerous comments and sounds from [Nissley] that included "it hurts," "ow f…, ow f…, ow f…, no" as well as repeated moans expected from someone in great pain. None of the contents of the recording from the hospital would rise even near to the level of express rejection of medical care.
>
> The noted actions of [Nissley] at the scene of the accident are subject to interpretation that could include resistance to touch due to pain or a delirious state of mind. While it is also possible to interpret [Nissley's] actions and words to be a rejection of medical care, they do not rise to a clear and unambiguous rejection and are certainly not of the level of rejection voiced by *Estrada*.
>
> Based upon the foregoing, it is the finding of this Court that law enforcement secured the blood sample in accordance with ARS Section 28-1388(E) and that the actions of [Nissley] did not constitute an express refusal to submit to medical treatment sufficient to mandate that a warrant be secure. As such, the Motion to Suppress is denied.

¶19        After an 18-day trial, the jury found Nissley guilty of the lesser-included offense of reckless manslaughter on the second degree murder count, and guilty of the remaining offenses as charged. The superior court sentenced Nissley to an aggravated prison term of 15 years for the manslaughter conviction and concurrent prison terms of 3 years on each of the other convictions. From Nissley's timely appeal, challenging the superior court's denial of his motion to suppress, this court has jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. §§ 12-120.21(A)(1), 13-4031 and -4033.

## DISCUSSION

### I.        The Legal Standards Governing The Taking Of Blood Samples.

¶20        A blood draw is a search under the Fourth Amendment to the United States Constitution, applicable here through the due process clause of the Fourteenth Amendment. *State v. Spencer*, 235 Ariz. 496, 498 ¶ 9, 333 P.3d 823, 825 (App. 2014) (citing *State v. Estrada*, 209 Ariz. 287, 290 ¶ 11, 100 P.3d 452, 455 (App. 2004)). As noted in *Spencer* and *Estrada*, there are three ways police could obtain a blood sample from Nissley consistent with the directives of the Fourth Amendment.

¶21        *First,* upon a showing of probable cause, a warrant could be obtained for a blood sample. *Spencer*, 235 Ariz. at 498 ¶ 9, 333 P.3d at 825 (citing *Estrada*, 209 Ariz. at 290 ¶ 11, 100 P.3d at 455); *see also Illinois v. Gates*, 462 U.S. 213, 236 (1983) (noting "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant"). Had the police done so here, the sole issue raised by Nissley on appeal would have been avoided. Indeed, the Dissent at ¶ 52 acknowledges that a search warrant properly would have issued and that the blood sample properly could have been obtained on this independent basis. However, it is undisputed that no warrant was obtained for the blood sample taken from Nissley.

¶22        *Second*, Nissley could have consented to provide a blood sample, either expressly or impliedly. *Spencer*, 235 Ariz. at 498 ¶ 9, 333 P.3d at 825 (citing *Estrada*, 209 Ariz. at 290 ¶ 11, 100 P.3d at 455); *see also* A.R.S. § 28-1321(A) (implied consent). The record does not reflect that Nissley expressly consented, and the parties' arguments indicated that Nissley revoked implied consent. When no express consent is provided, when implied consent is revoked and when no warrant is obtained, police are limited to the third option. *See* A.R.S. § 28-1321(D)(1) (noting if person revokes implied consent, blood test "shall not be given, except as provided in section 28-1388, subsection E or pursuant to a search warrant").

**¶23** *Third*, pursuant to the medical blood draw exception to the warrant requirement,

> if a law enforcement officer has probable cause to believe that a person has violated [A.R.S.] § 28–1381 and a sample of blood, urine or other bodily substance is taken from that person for any reason, a portion of that sample sufficient for analysis shall be provided to a law enforcement officer if requested for law enforcement purposes.

A.R.S. § 28-1388(E). As construed, this statutory exception to the Fourth Amendment's warrant requirement does not apply when a person "exercises his or her constitutional right to refuse medical treatment," and does so "unambiguously," "clearly and expressly." *Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶15, 100 P.3d at 455 n.2, 456.[3] The issues presented here are whether, on the record before it, the superior court erred in finding the State showed that (1) it had probable cause to believe that Nissley violated A.R.S. § 28-1381 and (2) Nissley did not unambiguously, clearly and expressly refuse medical treatment.

**¶24** "The State, as the party seeking to admit evidence seized without a warrant, had the burden of establishing the medical blood draw exception's applicability to these facts." *Spencer*, 235 Ariz. at 499 ¶ 12, 333 P.3d at 826 (citation omitted).[4] This court reviews the denial of a motion to

---

[3] The Arizona Supreme Court has restricted the "for any reason" language "to mean that the blood must be drawn by medical personnel for any medical reason." *State v. Cocio,* 147 Ariz. 277, 284, 709 P.2d 1336, 1345 (1985) (construing statutory predecessor). The superior court found that "the necessary medical care of [Nissley] at the hospital meets this prerequisite," a finding not challenged on appeal. Nissley apparently remained hospitalized for several days after the crash.

[4] The Dissent at ¶¶ 41 and 46 concludes the superior court improperly shifted the burden of proof, thereby relieving the State of its burden to prove voluntary consent to medical treatment, and imposing upon Nissley the burden of proving the adequacy of his rejection. The record, however, does not support such a conclusion. During argument at the suppression hearing, the superior court expressly recognized the State had the burden of proof, and nothing in its detailed minute entry denying the motion to

suppress for an abuse of discretion. *Id*. at 498 ¶ 8, 333 P.3d at 825 (citing cases); *Estrada*, 209 Ariz. at 288 ¶ 2, 100 P.3d at 453. The superior court, not this court, weighs and assesses witness credibility. *Estrada*, 209 Ariz. at 288, ¶ 2, 100 P.3d at 453. This court defers to the superior court's factual findings that are supported by the record and not clearly erroneous. *Id.* Legal conclusions and mixed questions of law and fact are reviewed de novo. *Spencer*, 235 Ariz. at 498 ¶ 8, 333 P.3d at 825 (citing cases).

## II.   The Superior Court Properly Found The Police Had Probable Cause To Believe Nissley Violated A.R.S. § 28–1381 Before The Blood Draw.

**¶25**     Because law enforcement is not required "to show that the operator was in fact under the influence[,] only the probability and not a prima facie showing of intoxication is the standard for probable cause." *State v. Aleman*, 210 Ariz. 232, 237 ¶ 15, 109 P.3d 571, 576 (App. 2005) (citation omitted). The police must have "collective knowledge" of "reasonably trustworthy information of facts and circumstances which are sufficient in themselves to lead a reasonable person to believe an offense has been committed and that the person to be arrested did commit it." *Id.* (citation omitted). As applied, the testimony of first-responder police officers demonstrates there was probable cause to believe Nissley violated A.R.S. § 28-1381 before the blood draw.

**¶26**     On appeal, Nissley focuses on other evidence considered by the superior court, suggesting the crash may have been caused by a medical emergency, the initial investigation did not include determining "if drugs (legal or otherwise) were present" and Plotnik "had not even made an assessment as to whether she believed [Nissley] was under the influence of alcohol or drugs." It is true that the testimony at the hearing was not always consistent or definitive, causing the superior court to conclude that each of the first-responders who testified at the suppression hearing "had a somewhat different perspective but there were inherent similarities to their versions of events." Resolving such issues involves the assessment of

---

suppress was inconsistent with that recognition. Nissley's opening and reply briefs on appeal do not argue the superior court shifted the burden of proof from the State. On appeal, this court allowed supplemental briefing on the applicability of *Spencer*, which was decided after Nissley's sentencing and appeal, and the burden of proof. The parties' supplemental briefs acknowledged that the State had the burden of proof and, consistent with his prior positions, Nissley did not argue the superior court shifted the burden of proof from the State.

credibility, which is for the superior court alone. *Estrada*, 209 Ariz. at 288 ¶ 2, 100 P.3d at 453. Moreover, the standard for probable cause "is not a subjective standard but an objective one." *State v. Turner*, 142 Ariz. 138, 141, 688 P.2d 1030, 1033 (App. 1984). The issue is whether the evidence supports the finding that the "collective knowledge" of the police showed probable cause. *Aleman*, 210 Ariz. at 237 ¶ 15, 109 P.3d at 576. The record from the suppression hearing supports the superior court's finding that the police had probable cause to believe that Nissley was driving while impaired to the slightest degree and, therefore, had violated A.R.S. § 28-1381(A)(1). *See Aleman*, 210 Ariz. at 237 ¶ 15, 109 P.3d at 576; *see also State v. Quinn*, 218 Ariz. 66, 69-70 ¶ 10, 178 P.3d 1190, 1193-94 (App. 2008) (depending on circumstances, unexplained erratic driving may give rise to probable cause for DUI) (dicta). Accordingly, the superior court did not err in finding the police had probable cause to believe Nissley violated A.R.S. § 28–1381 before the blood draw.

## III. The Superior Court Properly Found The State Showed Nissley Did Not Unambiguously, Clearly And Expressly Refuse Medical Treatment.

¶27 Nissley argued to the superior court that *Estrada* "answered" the "precise question" presented here. Under *Estrada*, the medical blood draw exception to the warrant requirement does not apply when a person "exercises his or her constitutional right to refuse medical treatment," and does so "unambiguously," "clearly and expressly." *Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶ 15, 100 P.3d at 455 n.2, 456; *see also Spencer*, 235 Ariz. at 499 ¶ 13, 333 P.3d at 826 (citing *Estrada*). Nissley argues he unambiguously, clearly and expressly refused medical treatment. Nissley also claims "it is undisputed that" he did not want to be transported to the hospital and did not want medical assistance on the trip to the emergency room. The State argues Nissley was not "alert and oriented" when contacted by paramedics and that his statements to paramedics were not the clear and express refusal of medical treatment required by *Estrada*.

### A. The Concerns Expressed In *Estrada* And *Spencer* Are Not Present In This Case.

¶28 In *Estrada*, after a fatal accident, the defendant initially agreed to go to the hospital but then, while en route to the hospital in an ambulance, "apparently changed his mind." 209 Ariz. at 289 ¶ 4, 100 P.3d at 454. A police officer "then handcuffed and shackled [defendant] to the gurney." 209 Ariz. at 289 ¶ 5, 100 P.3d at 454. After being "secured to the gurney, he still expressed a desire to get out of the ambulance." *Id.* Following an evidentiary hearing, the superior court granted defendant's motion to

suppress test results of blood drawn at the hospital. 209 Ariz. at 289 ¶ 7, 100 P.3d at 454. On appeal, deferring to the superior court's finding that the defendant "unambiguously," "clearly and expressly" refused medical treatment, *Estrada* found no abuse of discretion in granting defendant's motion to suppress. *Id.* at 292 ¶ 23, 100 P.3d at 457. In doing so, *Estrada* stated the medical draw exception did not apply "when the person is subjected to medical treatment that the person has expressly rejected," finding that a contrary holding would allow "an unscrupulous police officer . . . [to] have the person forcibly taken to the hospital under the pretext of needing medical treatment in order to procure a blood sample without first obtaining a warrant." 209 Ariz. at 290-91 ¶¶ 13, 14, 100 P.3d at 455-56.

¶29 Here, by contrast, nothing in the record suggests that police officers directed or had anything to do with the decision to take Nissley to the hospital or to draw his blood at the hospital. Officer Jones testified that he did not tell the paramedics he wanted Nissley transported to the hospital and did not assist in doing so. Similarly, EMT Lowery testified that no police officer told him that they wanted Nissley taken to the hospital. Lowery added that Nissley's blood was taken according to hospital protocol, not at his direction. Accordingly, the concerns identified in *Estrada* about "an unscrupulous police officer" directing medical treatment to obtain a blood sample are not present here.

¶30 In *Spencer*, decided after Nissley was convicted and sentenced, the defendant "steadfastly refused medical treatment. She capitulated *only* after being told [by a police officer] she would be arrested if she did not go to the hospital." 235 Ariz. at 499-500 ¶ 15, 333 P.3d at 826-27. Given this "ultimatum," *Spencer* found the defendant's decision to go to the hospital (rather than jail) was "the product of coercion or duress" by the police officer and, accordingly, involuntary. 235 Ariz. at 499-500 ¶¶ 14, 16, 333 P.3d at 826-27. Thus, *Spencer* held that the police officer's directive to either go to jail or go to the hospital removed from the defendant the ability to voluntarily refuse medical care. *Id*. at 500 ¶ 16, 333 P.3d at 827. Unlike *Spencer*, however, there is no suggestion that any police officer had any involvement in the decision to transport Nissley to the hospital, threatened jail if he did not or had any involvement in the decision to draw his blood at the hospital. As a result, there was no "ultimatum" or police directive leading to the decision to draw blood from Nissley. Accordingly, Nissley did not face the Hobson's choice presented to the defendant by the police in *Spencer*.

**B.      Under *Estrada* And *Spencer*, Nissley Has Not Shown The Superior Court Abused Its Discretion In Denying The Motion to Suppress.**

¶31      Even if the facts here implicated the concerns expressed in *Estrada* and *Spencer* about "an unscrupulous police officer," the issue would be whether the superior court abused its discretion on this record in finding that the State proved Nissley did not unambiguously, clearly and expressly refuse medical treatment. *Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶15, 100 P.3d at 455 n.2, 456; *see also Spencer*, 235 Ariz. at 499 ¶ 13, 333 P.3d at 826 (citing *Estrada*). As applied, this inquiry focuses on three locations:  (1) at the scene of the crash; (2) in the ambulance on the way to the hospital and (3) at the hospital. *See Estrada*, 209 Ariz. at 289 ¶¶ 4-5, 100 P.3d at 454 (where defendant consented to medical treatment and revoked consent and, by implication, recognizing the opposite could occur).

¶32      As the superior court's ruling reflects, the record includes no statement by Nissley specifically refusing medical assistance at the scene of the crash. He repeatedly stated he did not want help from first responders (including paramedics), for them to "leave him alone" and physically resisted efforts at aid and struck at first responders with closed fists. He also kicked his legs free when he was on a gurney and attempted to kick at medical personnel as they were placing him into an ambulance. As the superior court noted, the actions at the scene of the crash

> are subject to interpretation that could include resistance to touch due to pain or a delirious state of mind. While it is also possible to interpret [Nissley's] actions and words to be a rejection of medical care, they do not rise to a clear and unambiguous rejection and are certainly not of the level of rejection voiced by *Estrada.*

On this record, and given the deference owed to the superior court's factual findings that provide the foundation for this conclusion, Nissley has not shown that the court erred in concluding that the State had shown Nissley did not unambiguously, clearly and expressly reject medical care at the scene of the crash. *Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶ 15, 100 P.3d at 455 n.2, 456; *see also Spencer*, 235 Ariz. at 499 ¶ 13, 333 P.3d at 826 (citing *Estrada*).

¶33      Nor does the evidence from the ambulance ride alter the analysis. The testimony of McDonald and Lowery, who rode with Nissley in the ambulance, does not suggest Nissley took a different position during

the ride to the hospital. On this record, Nissley has not shown that the superior court erred in concluding the State showed Nissley did not unambiguously, clearly and expressly reject medical care during the ambulance trip to the hospital. *Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶15, 100 P.3d at 455 n.2, 456; *see also Spencer*, 235 Ariz. at 499 ¶ 13, 333 P.3d at 826 (citing *Estrada*).

¶34        Finally, the testimony from Lowery and Plotnik suggests Nissley did not unambiguously, clearly and expressly reject medical care at the hospital, where he first was treated by nurses and doctors and where his blood was drawn. Plotnik testified that Nissley never told the nurses or doctors he did not want medical treatment. And the recording from the hospital, the substance of which is not of record on appeal, is presumed to support the superior court's ruling, including the conclusion that "[n]one of the contents of the recording from the hospital would rise even near to the level of express rejection of medical care." *See Cullison v. City of Peoria*, 120 Ariz. 165, 168 n.2, 584 P.2d 1156, 1159 n.2 (1978) ("where an incomplete record is presented to an appellate court, the missing portions of that record are to be presumed to support the action of the trial court") (citing cases).

¶35        Referring to the medical treatment provided at the hospital, the Dissent at ¶ 48 states "an eventual capitulation to the persistent demands of medical personnel" cannot "qualify as 'free' and 'voluntary' submission to treatment." The record, however, does not reflect any "demands of medical personnel" at the hospital and the missing recording is presumed to support a contrary finding. Moreover, the superior court properly could find the records received in evidence do not show a rejection of medical treatment by Nissley at the hospital, any demands of medical personnel or a capitulation to such demands by Nissley. These records do not run counter to the superior court's factual finding that the State showed Nissley did not expressly reject medical treatment at the hospital. Nissley has not shown that the superior court erred in concluding that the State showed Nissley did not unambiguously, clearly and expressly reject medical care at the hospital. *See Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶15, 100 P.3d at 455 n.2, 456; *see also Spencer*, 235 Ariz. at 499 ¶ 13, 333 P.3d at 826 (citing *Estrada*).[5]

_____

[5] Although the Dissent at ¶ 49 states the superior court's ruling "arguably results in structural error, . . . which cannot be harmless and need not have been raised" with the superior court, Nissley has never claimed structural error and his motion to suppress preserved the issue discussed above.

\* \* \* \* \*

**¶36**        The Dissent advocates for a standard different than *Estrada* and, in concluding the superior court applied the incorrect legal standard, takes exception to the application of *Estrada* to this case. The Dissent does not, however, argue that the analysis in *Estrada* was incorrect or that *Estrada* was wrongly decided. And it bears repeating that Nissley's motion to suppress relied exclusively on *Estrada*, argued *Estrada* answered the "precise question" presented here and stated *Estrada*'s test was whether the blood was "drawn from an individual who expressly refused medical treatment." Having been asked by Nissley to apply the legal standard set forth in *Estrada*, the superior court cannot be faulted for then applying *Estrada*'s test to the facts presented. It is also hard to find fault with the superior court not applying a standard that Nissley has not advocated and that does not appear in *Estrada*.[6]

**¶37**        Nor did Nissley change course on appeal. Although citing cases supporting the proposition that a person typically may refuse medical treatment and that a blood draw is a seizure under the Fourth Amendment, Nissley's opening brief on appeal argues that the blood draw ran afoul of *Estrada*. At no point does Nissley challenge the *Estrada* analysis. "The rule that issues not clearly raised in the opening brief are waived serves to avoid surprising the parties by deciding their case on an issue they did not present

---

Moreover, the Dissent cites no case applying structural error to an appeal from the denial of a motion to suppress. *See State v. Tucker*, 215 Ariz. 298, 316 ¶ 66, 160 P.3d 177, 195 (2007) ("We have recognized structural error in only a few instances," such as "when trial judge biased; defendant denied counsel, access to counsel, self-representation, and public trial; reasonable doubt instructions defective; and jurors excluded because of race or views on death penalty") (citing authority).

[6] An additional reason for the requirement that a defendant unambiguously, clearly and expressly refuse medical treatment as set forth in *Estrada* is to allow law enforcement to timely assess alternatives. Here, had Nissley unambiguously, clearly and expressly refused medical treatment, law enforcement likely would have obtained a warrant to secure a blood sample. *Cf. Missouri v. McNeely*, 133 S. Ct. 1552, 1563 (2013) (noting that blood alcohol content "is lost gradually and relatively predictably," such that the "natural dissipation of alcohol in the blood" does not support a finding of exigency "categorically").

and to prevent the court from deciding cases with no research assistance or analytical input from both parties." *State v. Lopez*, 223 Ariz. 238, 240 ¶ 6, 221 P.3d 1052, 1054 (App. 2009) (citations omitted). Although Nissley argues the superior court misapplied *Estrada*, the time for Nissley to argue that an analysis different than *Estrada* should apply has long since passed.

**¶38**        Finally, it is true that the evidence considered by the superior court was not entirely consistent. The superior court acknowledges as much in noting Nissley's actions at the scene were "subject to interpretation." This court, however, defers to the superior court's factual findings that are supported by the record and not clearly erroneous. *Estrada*, 209 Ariz. at 288 ¶ 2, 100 P.3d at 453. On this record, Nissley has not shown that the superior court erred in weighing and assessing the testimony and other evidence received at the suppression hearing and concluding that the State showed Nissley did not unambiguously, clearly and expressly reject medical care at the hospital. *See Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 291 ¶ 15, 100 P.3d at 455 n.2, 456; *see also Spencer*, 235 Ariz. at 499 ¶ 13, 333 P.3d at 826 (citing *Estrada*).[7] Accordingly, Nissley has not shown that the court erred in denying his motion to suppress.

## CONCLUSION

**¶39**        At sentencing, the superior court ordered Nissley to "pay the applicable fee for the cost of" his DNA testing. In *State v. Reyes*, 232 Ariz. 468, 472 ¶ 14, 307 P.3d 35, 39 (App. 2013), this court held that A.R.S. § 13–610 does not authorize the court to impose a DNA testing fee on a convicted defendant. Accordingly, pursuant to *Reyes*, which was issued after Nissley was sentenced, his sentence is modified to vacate the requirement that Nissley pay for the cost of DNA testing. In all other respects, Nissley's convictions and sentences are affirmed.

---

[7] Given this conclusion, this court need not address the State's argument that Nissley lacked the capacity to deny consent to receive medical care, which may justify a warrantless blood draw where applicable. *See Estrada*, 209 Ariz. at 290 n.2 ¶ 9, 100 P.3d at 455 n.2 (noting person who is unconscious or otherwise rendered incapable of refusing medical treatment "'is deemed not to have withdrawn'" implied consent) (quoting A.R.S. § 28-1321(C)).

**J O N E S, J.,** dissenting in part:

¶40      In my view, the trial court applied the incorrect legal standard in denying the motion to suppress. Although the majority correctly notes there has never been any dispute that the State bears the burden of establishing "the lawfulness in all respects of the acquisition of all evidence which [it] will use at trial," Ariz. R. Crim. P. 16.2(b), the question remains as to *what* the State must prove to admit blood evidence obtained pursuant to the "medical purpose" exception to the warrant requirement, enumerated within A.R.S. § 28-1388(E). This provision allows law enforcement to obtain and test a sample of a person's blood taken for medical purposes if probable cause exists to believe the person has violated Arizona's DUI laws. *See State v. Cocio*, 147 Ariz. 277, 284, 709 P.2d 1336, 1345 (1985); *State v. Aleman*, 210 Ariz. 232, 236, ¶ 11, 109 P.3d 571, 575 (App. 2005). We have held that the statute does not apply "when a person is receiving medical treatment against his or her will." *State v. Estrada*, 209 Ariz. 287, 291, ¶ 15, 100 P.3d 452, 456 (App. 2004).

¶41      Here, the trial court admitted the challenged blood evidence after finding the State had proven Nissley's actions "d[id] not constitute an express refusal to submit to medical treatment" in the manner "contemplated by *Estrada*." The majority accepts this as the standard and defers to the trial court's findings. However, a discussion limited to whether the rejection of medical treatment is unequivocal, and therefore sufficient to preserve the defendant's constitutionally protected right to bodily integrity, is misleading and contrary to established Fourth Amendment jurisprudence. Predicating suppression of the blood evidence upon the sufficiency of a rejection of medical care upends the historical requirement of consent in the absence of a warrant. At a minimum, this relieves the State of its full burden of proving the admissibility of the blood evidence, and in application may result in a *de facto* shifting of the burden of proof to the defendant to prove the "adequacy" of his rejection, upon no greater evidence being presented than the suggestion by the State that the rejection was unclear or ambiguous. For these reasons, I would hold the proper inquiry is not whether the defendant was able to prove he adequately rejected medical care, but rather, whether he freely and voluntarily consented to medical treatment. *See State v. Spencer*, 235 Ariz. 496, 499, ¶ 12, 333 P.3d 823, 826 (App. 2014). Even viewing the facts in the light most favorable to affirming the trial court's order, the State did not present any evidence of consent. Therefore, I respectfully dissent from the majority's conclusion that Nissley failed to demonstrate reversible error.

## DISCUSSION

¶42         In *State v. Estrada*, we held the medical purpose exception does not apply "when a person is receiving medical treatment against his or her will."  209 Ariz. at 291, ¶ 15, 100 P.3d at 456.  Apparently guided by the specific facts of *Estrada*, where the defendant "changed his mind about going [to the hospital] voluntarily and became agitated and attempted to get out of the ambulance," we attempted to further define the issue by adding: "In other words, if a person exercises his or her constitutional right to refuse medical treatment in the first place, and does so clearly and expressly . . . he or she cannot be forced to accommodate law enforcement's desire for a blood sample."  *Id.* at 289, 291, ¶¶ 4, 15, 100 P.3d at 454, 456.  It is the "other words" the majority focuses upon in affirming the trial court's denial of Nissley's motion to suppress, *see infra* ¶ 9, and which the State relies upon in arguing its responsibility was "to show the defendant did not expressly reject treatment."  However, the two statements, while leading to the same result in *Estrada*, are not the same.  In my view, it is the initial statement which was intended to fix the standard for determining the applicability of A.R.S. § 28-1388(E).

¶43         The phrase "against his will," as articulated in *Estrada*, is admittedly problematic.  Indeed, it is unworkable to require the State to prove medical treatment was "against the will" of the defendant; the State has no interest or incentive to offer proof illustrating the *in*applicability of the statute it is relying upon to establish the admissibility of its evidence.  It would be equally inappropriate and unconstitutional to place the burden upon the defendant to prove the statutory exception to the warrant requirement does *not* apply, i.e., that the treatment was given "against his will."  *See State v. Ault*, 150 Ariz. 459, 464, 724 P.2d 545, 550 (1986) ("The burden is on the state when it seeks an exception to the warrant requirement.") (citation omitted).  And, because the parties in *Estrada* did not dispute that the defendant was transported to the hospital "against his will," the opinion does not address what, precisely, the State must prove in order to establish the admissibility of blood evidence obtained pursuant to A.R.S. § 28-1388(E).

¶44         The majority settles the semantical problem presented by the phrase "against his will" by allowing the State to proceed solely upon evidence that the defendant's attempted rejection of medical care was insufficient.  This interpretation is not consistent with the commonly understood meaning of the phrase "against the will," which is typically used to indicate a lack of consent.  *See Large v. Superior Court*, 148 Ariz. 229, 234, 714 P.2d 399, 404 (1986) (noting drugs administered to petitioner were "against his will" where he refused to consent to treatment); *State v. Miguel*,

125 Ariz. 538, 542, 611 P.2d 125, 129 (App. 1980) (holding that consent is a defense to a crime that requires the State to prove a taking was "against the will" of the victim); *Fonseca v. Hall*, 568 F. Supp. 2d 1110, 1131 (C.D. Cal. 2008) ("[A] finding that the victims were confined against their will necessarily implied that the victims had not consented.") (internal quotation and citation omitted); *Against the Will*, Black's Law Dictionary (10th ed. 2014) (noting "against the will" is used in indictments to indicate a lack of consent). *Estrada* itself suggests some lesser level of resistance would be sufficient, noting that its holding would apply to an "attempt[] to decline medical treatment by refusing to go to the hospital" — something less than an express rejection of care. 209 Ariz. at 291 n.3, ¶ 15, 100 P.3d at 456 n.3.

¶45        More importantly, the majority's approach conflicts with long-standing federal and state constitutional authority intended to protect persons from unreasonable bodily intrusion. This authority applies independent from the legislative direction contained in A.R.S. § 28-1388(E). *State v. Butler*, 232 Ariz. 84, 88, ¶ 18, 302 P.3d 609, 613 (2013). Indeed, in over two hundred years of Fourth Amendment jurisprudence, I am unaware of any court, in any jurisdiction, having ever upheld the validity of a warrantless intrusion premised purely upon the inadequacy of the defendant's objection to the search; instead, courts have inerrantly required the State to affirmatively establish consent. *See, e.g., United States v. Murphy*, 516 F.3d 1117, 1124-25 (9th Cir. 2008) (noting a "refusal to grant consent" effectively bars a warrantless search); *Karwicki v. United States*, 55 F.2d 225, 226 (4th Cir. 1932) ("The fact that [the defendant] did not protest against the search of his living quarters is without significance. He was not required to protest. The officers had no right to search same without a warrant, unless they had his consent to the search."); *United States v. Lerner*, 100 F. Supp. 765, 767 (N.D. Cal. 1951) (declining to find consent where it was "apparent that the attitude of the defendant was one of protest rather than consent"). This Court recognized as much in *State v. Spencer*, which recently articulated the State's burden, "as the party seeking to admit evidence seized without a warrant [and] establish[] the medical [purpose] exception's applicability," to include "demonstrating that . . . consent [to medical treatment] was 'freely and voluntarily given.'" 235 Ariz. at 499, ¶ 12, 333 P.3d at 826 (citing *Butler*, 232 Ariz. at 88, ¶ 19, 302 P.3d at 613, and *State v. Peterson*, 228 Ariz. 405, 408, ¶ 9, 267 P.3d 1197, 1200 (App. 2011)). And requiring consent is consistent with statutory and judicially recognized exceptions to the warrant requirement. *See* A.R.S. § 28-1321(A) (implied consent); *Butler*, 232 Ariz. at 87, ¶ 13, 302 P.3d at 612 (2013) (recognizing "[c]onsent can also allow a warrantless search" in the context of blood drawn during a DUI investigation).

¶46　　　　Yet, the trial court did not require the State to prove Nissley consented to medical treatment, and the State's evidence objectively fails to establish consent. Whether consent is given is a question determined by the totality of the circumstances, *State v. Paredes*, 167 Ariz. 609, 612, 810 P.2d 607, 610 (App. 1991) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973), and *State v. King*, 140 Ariz. 602, 604, 684 P.2d 174, 176 (App. 1984)), and an exception to the warrant requirement must be proven "'by clear and positive evidence in unequivocal words or conduct expressing consent,'" *State v. Canez*, 202 Ariz. 133, 151, ¶ 53, 42 P.3d 564, 582 (2002) (quoting *State v. Kananen*, 97 Ariz. 233, 235, 399 P.2d 426, 427 (1965)); *see also United States v. Shaibu*, 920 F.2d 1423, 1427-28 (9th Cir. 1990) ("The consent [to a search] must be unequivocal and specific and freely and intelligently given.") (internal quotations omitted). "Failing to actively resist or vocally object to a test does not itself constitute express agreement. Instead, . . . the arrestee must unequivocally manifest assent to the [warrantless chemical] testing by words or conduct."[8] *Carrillo v. Houser*, 224 Ariz. 463, 466-67, ¶ 19, 232 P.3d 1245, 1248-49 (2010) (holding actual consent is required prior to chemical testing initiated under A.R.S. § 28-1321 and noting the legislature's clarification that a "failure to expressly agree constitutes a refusal" to take the test under A.R.S. § 28-1321(B)); *see also Stoner v. California*, 376 U.S. 483, 489 (1964) (noting defendant could waive Fourth Amendment rights only "by word or deed"). Upon these principles, the trial court was tasked with determining whether the State met its burden of showing Nissley freely and voluntarily exhibited a manifestation of consent to medical treatment. Although the trial court acknowledged that the State had the burden of proof, it considered only the sufficiency of Nissley's objection to medical

---

[8]　　　　An eloquent and detailed statement of refusal is not and cannot be required to overcome the State's burden of showing free and voluntary consent. The necessity of uttering a specific phrase at the precisely correct moment would create an artificial predicate to finding a refusal that is neither mandated by, nor consistent with, the broad protections against bodily invasion contained within the U.S. and Arizona Constitutions. *See United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996) ("A suspect need not rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent.") (cited with approval by *State v. Cota*, 229 Ariz. 136, 145, ¶ 26, 272 P.3d 1027, 1036 (2012)). Under some circumstances, a verbal announcement may not be necessary or even possible, and our supreme court has already recognized that active resistance and vocal objections are not necessary to negate consent. *Carrillo*, 224 Ariz. at 466-67, ¶ 19, 232 P.3d at 1248-49. It necessarily follows that such activity is, at a minimum, affirmative evidence of a lack of consent.

treatment — ultimately determining that, while Nissley may have rejected, he did not reject *enough*.

¶47    The trial court's conclusion that Nissley's rejection was insufficient places in stark contrast the difference between requiring proof from the State that the defendant consented to medical treatment, and requiring proof that he "unambiguously, clearly and expressly rejected" treatment. The record is replete in its characterization of Nissley's lack of consent, having been strapped to a backboard for placement in the ambulance, working his feet free, cursing and screaming as he tried to kick the emergency medical personnel to prevent them from putting him into the ambulance for transportation to the hospital, and wiggling his body furiously in an attempt to keep the paramedics from touching him or otherwise providing aid. The record indicates that from the moment emergency personnel arrived at the scene of the accident at approximately 5:40 p.m., until his forced sedation and subsequent blood draw nearly an hour later, Nissley was "extremely combative," screaming "leave me alone," "don't touch me," "I don't want your help," "I'm fine," and "just go away," interlaced with near-constant profanity and name-calling. There is no legal interpretation capable of being given this conduct or these phrases, especially when uttered to a paramedic actively attempting to render medical care, that stands apart from their ordinary everyday meaning, which would give rise to a finding of free and voluntary consent.[9] Yet, the trial court concluded, and the majority affirms, that these facts are insufficient to establish rejection of medical care.

¶48    Similarly, even accepting the trial court's suggestion that Nissley may have been reacting to pain at the time he arrived at the hospital, an expression of pain does not equate to free and voluntary consent to medical treatment. *See Rasmussen v. Fleming*, 154 Ariz. 207, 216-17, 741 P.2d 674, 683-84 (1987); *see also Hales v. Pittman*, 118 Ariz. 305, 309, 576 P.2d 493, 497 (1978) (noting "the fundamental right of every adult of sound mind to determine what should be done to his body"); *see also Cruzan ex rel. Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 305-06 (1990) (Brennan, J., dissenting) (noting "each man is considered to be master of his own body,

---

[9]    The majority implicitly recognizes the lack of evidence to establish Nissley's consent to medical treatment by limiting its use of the word "consent" to a discussion of inapplicable alternatives to A.R.S. § 28-1388(E), *supra* ¶¶ 22, 38 n.6, and a parenthetical explanation of revocation, *supra* ¶ 31, instead focusing its attention entirely upon the conclusion that "Nissley did not unambiguously, clearly and expressly reject medical care," *supra* ¶¶ 22, 31-35, 38.

and he may, if he be of sound mind, expressly prohibit . . . medical treatment" and therefore the right to bodily integrity protects the right to decline even lifesaving treatment) (quotation and citations omitted). Nor can an eventual capitulation to the persistent demands of medical personnel qualify as "free" and "voluntary" submission to treatment. *See Spencer*, 235 Ariz. at 499-500, ¶ 15, 333 P.3d at 826-27; *see also State v. Flannigan*, 194 Ariz. 150, 153, ¶ 16, 978 P.2d 127, 130 (App. 1998) (finding mere "'acquiescence to a claim of lawful authority'" insufficient to meet burden of establishing a person consented to a search) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). Yet, again, the trial court concluded, and the majority affirms, that the conduct was not an unambiguous rejection of medical care.

**¶49** The concept of consent is materially different from that of rejection. I would find the trial court applied the wrong standard in determining the applicability of A.R.S. § 28-1388(E) and, in doing so, abused its discretion. *State v. Mohajerin*, 226 Ariz. 103, 108, ¶ 18, 244 P.3d 107, 112 (App. 2010) ("When a trial court predicates its decision on an incorrect legal standard, . . . it commits an error of law and thereby abuses its discretion.") (citing *State v. Mangum*, 214 Ariz. 165, 167, ¶ 6, 150 P.3d 252, 254 (App. 2007)). The test adopted by the trial court puts the cart before the horse, *see United States v. Gray*, 369 F.3d 1024, 1026-27 (8th Cir. 2004) (considering whether defendant withdrew his consent only after recognizing that consent was originally granted), permits the State to introduce evidence obtained without a warrant based upon something less than the constitutionally required free and voluntary consent,[10] and arguably results in structural error, *see State v. Glassel*, 211 Ariz. 33, 53, ¶ 74, 116 P.3d 1193, 1213 (2005) (finding structural error where circumstance improperly reduces the state's burden of proof) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 280-82 (1993), and *State v. Portillo*, 182 Ariz. 592, 594, 898 P.2d 970, 972 (1995)); *see also State v. Henderson*, 210 Ariz. 561, 565, ¶ 12, 115 P.3d 601, 605 (2005) (defining structural errors as "those which 'deprive defendants of basic protections without which a criminal trial cannot reliably serve its

---

[10] Requiring the State to prove a defendant consented to medical treatment in order to admit evidence obtained pursuant to A.R.S. § 28-1388(E) would not affect the admissibility of bodily evidence obtained from an unconscious driver. *See supra* ¶ 38 n.6. Under A.R.S. § 28-1321(A), the unconscious driver has already given consent to chemical testing under certain circumstances when he operates a motor vehicle in this state and is incapable of revoking that consent under A.R.S. § 28-1321(C). Where the State chooses to proceed under this section, it need not separately prove consent to medical treatment.

function as a vehicle for guilt or innocence.'") (quoting *State v. Ring*, 204 Ariz. 534, 552, ¶ 45, 65 P.3d 915, 933 (2003)), which cannot be harmless and need not have been raised below, *see State v. Valverde*, 220 Ariz. 582, 585, ¶ 10, 208 P.3d 233, 236 (2009) ("If an appellate court finds structural error, reversal is mandated regardless of whether an objection is made below or prejudice is found."); *see also United States v. Atkinson*, 297 U.S. 157, 160 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

**CONCLUSION**

¶**50**      In the absence of consent to medical treatment, freely and voluntarily given, the medical purpose exception does not apply. Given the record before us, the State did not prove by a preponderance of the evidence that Nissley freely and voluntarily consented to medical care.[11] Therefore, I would find the warrantless seizure of Nissley's blood was improper, vacate Nissley's convictions and sentences, and remand for a new trial that does not include evidence derived from the blood draw.

¶**51**      I appreciate the concerns of the majority regarding the challenges faced by law enforcement in assessing available alternatives to gather what may be time-sensitive evidence. *See supra* ¶ 36 n.5. However, "a grudging or negative attitude by reviewing courts toward warrants . . . is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Constitutional protections are not subject to exception simply for the

---

[11]      The State argues a defendant must show it had some hand in forcing unwanted medical care upon him before the blood evidence can be suppressed. To read an additional requirement into the statute would run contrary to the legislature's chosen language, which articulates only the need for probable cause and a blood draw resulting from medical treatment voluntarily received. *See* A.R.S. § 28-1388(E); *Spencer*, 235 Ariz. at 499, ¶ 12, 333 P.3d at 826. And the law is express: in the absence of these elements, implied consent, or a warrant, "the [blood] test *shall not be given*." A.R.S. § 28-1321(A), (D)(1) (emphasis added). Given the clear statutory language, it is unsurprising no argument or evidence was presented at the suppression hearing, and the trial court made no findings, regarding law enforcement's willingness to allow Nissley to be removed from the accident scene, despite his protests, and transported to the hospital to receive medical treatment.

convenience of a criminal investigation, *see, e.g., United States v. Taylor*, 934 F.2d 218, 220 (9th Cir. 1991) ("We recognize that individual interests outrank government convenience in the fourth amendment balancing.") (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 557-58 (1976)), and our supreme court has rejected the notion that requiring law enforcement officers to obtain warrants for blood draws is unduly burdensome, *Butler*, 232 Ariz. at 87, ¶ 11 ("'In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.'") (quoting *Missouri v. McNeeley*, 133 S. Ct. 1552, 1561 (2013)). Moreover, while consideration of the degree of rejection is subjective, the concept of consent is not subject to a continuum; consent is either given or it is not. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (holding factual determination of consent must be judged against an objective standard) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)); *People v. Smith*, 638 P.2d 1, 6 (Colo. 1981) ("Whether consent existed at the relevant time is an objective fact.") (citing *People v. Edmonds*, 578 P.2d 655 (Colo. 1978)). The objective standard advanced herein will only assist law enforcement in the fair and orderly collection and preservation of evidence.

**¶52** I agree with the trial court's conclusion that probable cause existed to believe Nissley had violated A.R.S. § 28-1381. Based upon such probable cause, and where there was any question as to the applicability of A.R.S. § 28-1388(E), the officers could and should have secured a warrant to obtain a sample of Nissley's blood.

**¶53** For these reasons, I respectfully dissent.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama